```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            |
JON JONES, ET AL.,                                          |
                                                            |
                    Plaintiffs,                             |
                                                            |
        -against-                                           |    11 Civ. 8215 (KMW)
                                                            |    **OPINION & ORDER**
ERIC T. SCHNEIDERMAN, ET AL.,                               |
                                                            |
                    Defendants.                             |
                                                            |
------------------------------------------------------------X
```

KIMBA M. WOOD, U.S.D.J.:

Plaintiffs challenge the constitutionality of a 1997 New York state law prohibiting the live performance of professional mixed martial arts ("MMA") in New York. Zuffa, LLC, the leading MMA promoter doing business as the Ultimate Fighting Championship ("UFC"), together with a group of professional and amateur MMA athletes, MMA trainers, and MMA fans (collectively, "Plaintiffs") bring this action against the New York State Attorney General and the New York County District Attorney ("Defendants") to invalidate the law.

Plaintiffs' Complaint states seven counts: (1) as applied to Plaintiffs, the law violates their First Amendment rights of expression (Count I); (2) on its face, the law is overbroad, in violation of the First Amendment (Count II); (3) the law is unconstitutionally vague, in violation of the Due Process Clause (Count III); (4) the law violates the Equal Protection Clause (Count IV); (5) the law lacks a rational basis, in violation of the Due Process Clause (Count V); (6) the law violates the Commerce Clause (Count VI); and (7) as applied to Plaintiffs, a separate 2001 liquor law violates their First Amendment rights of expression (Count VII).

1

The Court directed Defendants to limit their initial Rule 12(b)(6) motion to dismiss to Count IV (Equal Protection) and Count V (Due Process irrationality).  For the reasons stated below, the 1997 law satisfies the rational basis scrutiny that is required by the Equal Protection and Due Process clauses.  Accordingly, the Court GRANTS Defendants' motion to dismiss Counts IV and V.

## I. BACKGROUND[1]

### A. Professional MMA

Professional MMA bouts feature fighters trained in various martial and combat arts, including karate, jiu-jitsu, boxing, kickboxing, grappling, judo, Muay Thai, and wrestling. (Compl. ¶ 1).  Fighters may strike their opponents while standing or while grappling on the ground, using fists, elbows, knees, and feet to subdue them.  (*Id.* at ¶¶ 39, 200.)  In UFC-sponsored contests, fights are typically staged inside "the Octagon," an eight-sided padded-floor platform surrounded by a chain-link fence.  (*Id.* at ¶ 40.)  Because the Octagon resembles a cage, MMA is sometimes colloquially referred to as "cage fighting."  (*Id.*)

Although the modern origins of MMA trace back to Brazilian full-contact martial arts developed 80 years ago, interest among American sports fans in MMA emerged in the early 1990s.  (*Id.* at ¶ 19).  The promoters of early MMA contests attracted interest by advertising the sport's violence and its risk to fighters.  (*Id.* at ¶ 23).  In what Plaintiffs acknowledge was an "ill-advised marketing strategy," fights were sold as "no holds barred" contests under the slogan "There Are No Rules!"  (*Id.*)  As one MMA advertisement promised, "Each match will run until

---

[1] The following facts are taken from Plaintiffs' Complaint and are assumed to be true for purposes of this limited motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

there is a designated winner—by means of knock-out, surrender, doctor's intervention, or *death*." (*Id.*)  In this context, many states banned MMA fighting.  (*Id.* at ¶ 5).

### B. Legislative History

In 1996, the New York Legislature held hearings on the question "Should New York Ban Extreme Fighting?"  (*Id.* at ¶ 35 n.15.)  At the hearings, representatives from the leading promoters testified about MMA's rules, and medical experts testified about the risks that the sport posed to fighters' safety.  (*Id.* at ¶¶ 71-78.)  Legislators who supported banning MMA voiced two primary concerns: (1) MMA fights posed a health and safety risk to fighters, and (2) MMA fights undermined public morals and had a negative influence on New York youth.  (*Id.* at ¶¶ 31-36.)

In 1997, the legislature enacted New York Unconsolidated Law § 8905-a, which prohibits the conduct of any "combative sport" within the state of New York.[2]  (*Id.* at ¶ 29.)  The statute defines a "combative sport" as "any professional match or exhibition" in which participants may deliver "kicks, punches or blows of any kind to the body of an opponent."  (*Id.* at ¶ 261.)  The statute exempts boxing, wrestling, and statutorily defined "martial arts" (including judo, karate, and tae kwon do).  (*Id.* at ¶¶ 261, 286.)  The practical effect of the legislation is to prohibit all professional MMA matches and exhibitions in New York.

### C. Evolution of MMA

Since the passage of the ban, the rules governing professional MMA have changed to make the sport safer and more palatable to a mainstream audience.  In 1997, weight classes for fighters were introduced.  (*Id.* at ¶ 42.)  In 1999, five-minute rounds were implemented.  (*Id.*)

---

[2] In 1996, the legislature initially passed a law providing for the regulation of professional MMA by the State Athletic Commission.  (Compl. ¶ 10; S.B. 7780, Ch. 708, 1996 Sess. (N.Y. 1996)). Shortly after the 1996 legislation went into effect, the legislature passed the 1997 statute at issue in this case, which instated a complete ban of the sport.  (Compl. ¶ 29.)

Rules were adopted to eliminate groin strikes, head butts, and joint manipulation, and to prohibit fighters from kicking downed opponents or striking them in the back of the neck and head.  (*Id.* at ¶¶ 41-42.)

In 2000, the New Jersey State Athletic Control Board sanctioned the first MMA fight under its Unified Rules of Mixed Martial Arts.  (*Id.* at ¶ 42.)  The following year, New Jersey became the first state to formally sanction MMA.  (*Id.* at ¶ 43.)  Nevada soon followed, largely adopting New Jersey's unified rules.  (*Id.*)  Today, 45 of the 48 states with athletic commissions have elected to regulate, rather than prohibit, MMA.  (*Id.* at ¶ 48.)  Although there is some variation in rules by state, most athletic commissions have adopted the unified rules codified by New Jersey.  (*Id.* at ¶ 43.)

Since that time, MMA has experienced what Plaintiffs describe as a "meteoric rise in popularity."  (*Id.* at ¶ 2.)  MMA is now reportedly the fastest growing spectator sport in the United States.  (*Id.* at ¶¶ 1, 64.)  Fights are now regularly broadcast on network and pay-per-view television, and Plaintiffs estimate that the UFC reaches five hundred million homes worldwide.  (*Id.* at ¶ 1.)  Although the UFC is MMA's largest promoter, many other promoters operate professional and amateur contests in the United States as well.  (*Id.* at ¶ 52.)  Despite developments in MMA's rules and safety practices, efforts to overturn the ban in the New York Legislature have failed.  (*Id.* at ¶ 66.)  It is within this context that Plaintiffs bring the instant action.

**II. DISCUSSION**

    **A. Applicable Legal Standard**

        *1. The Court Accepts Plaintiffs' Pleading as True for Purpose of the Motion to Dismiss*

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court must accept as true all well-pleaded factual allegations in the complaint, and "draw[] all inferences in the plaintiff's favor." *Allaire Corp. v. Okumus*, 433 F.3d 248, 249-50 (2d Cir. 2006) (citation omitted).

        *2. The Court Applies Rational Basis Scrutiny to the Equal Protection and Due Process Challenges*

The Fourteenth Amendment to the United States Constitution states that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This language has been interpreted to mean that, in legislation, "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Where a challenged law neither singles out a suspect class nor interferes with a fundamental right, courts require only that it satisfy rational basis scrutiny. *Hayden v. Paterson*, 594 F.3d 150, 170 (2d Cir. 2010) (Equal Protection); *Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009) (Due Process). Plaintiffs do not claim to be members of a "suspect" or a "quasi-suspect class." As a sport, professional MMA does not implicate a fundamental right.[3] Accordingly, the Court applies rational basis scrutiny to the ban under Plaintiffs' Equal

---

[3] Because the parties have not briefed the question of whether MMA constitutes expressive conduct, the Court does not address the issue with respect to this motion.

5

Protection and Due Process challenges.[4] Because Plaintiffs' factual allegations supporting Counts IV and V are substantively the same, the Court considers the Equal Protection and Due Process challenges together.

Rational basis scrutiny requires legislation to be "rationally related to a legitimate state interest." *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997) (quoting *City of Cleburne*, 473 U.S. at 440). The Supreme Court has emphasized that the standard of review is "a paradigm of judicial restraint." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). In "areas of social and economic policy," a statutory classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 313. A court will not invalidate a law unless the "varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [it] can only conclude that the legislature's actions were irrational." *Hayden*, 594 F.3d at 170 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).

### 3. The Court Need Not Decide Whether Changed Circumstances Are Relevant in Reviewing the Law for a Rational Basis

Defendants assert that, in considering whether the law has a rational basis, the relevant question is whether the law was rational at the time of *enactment*. Plaintiffs counter that the Court must also consider any changed circumstances *since* the time of its enactment, including contemporary medical studies that suggest MMA is at least as safe as other permitted sports, and contemporary MMA rules that have made the sport safer than it was when the ban was enacted.

As the Third Circuit has noted, "the Supreme Court appears not to have determined definitively whether changed conditions are a relevant consideration in equal protection

---

[4] When a challenged statute satisfies rational basis review under the Equal Protection Clause, "it follows *a fortiori* that the Act does not violate the Fourteenth Amendment's Due Process Clause." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 470 n.12 (1981).

analysis." *Murillo v. Bambrick*, 681 F.2d 898, 912 n.27 (3d Cir. 1982); *see also Burlington N. R.R. Co. v. Dep't of Pub. Serv. Regulation*, 763 F.2d 1106, 1111 (9th Cir. 1985) ("The Supreme Court has been ambivalent on whether changed circumstances can transform a once-rational statute into an irrational law."). Plaintiffs' position has some support in existing case law. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938) (citing *Chastleton Corp. v. Sinclair*, 264 U.S. 543 (1924) for the proposition that "the constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist"). In *Chastleton*, the Court reversed a lower court decision that had upheld a two-year extension of rent-control legislation enacted shortly after World War I. 264 U.S. at 547-48. The Court remanded for a finding of whether the housing crisis had ended. *Id.* As the Court held, "A law depending upon the existence of an emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." *Id.*

Other decisions, however, lend support to the proposition that the relevant question is whether a statute was rational at the time of enactment. *See, e.g.*, *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 (1911) ("[I]f any state of facts reasonably can be conceived that would sustain [a statute], the existence of that state of facts *at the time the law was enacted* must be assumed." (emphasis added)). Most recently, the Supreme Court has held that, "[w]here there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981). In *Clover Leaf Creamery*, the Court held that there was a rational basis for a statute that banned the retail sale of milk in plastic nonrefillable cartons, but that permitted the sale in paperboard

7

nonrefillable cartons, for environmental reasons. *Id.* at 470. Addressing evidence that suggested paperboard cartons were in fact more harmful to the environment than plastic cartons, the Court found that it was irrelevant "[w]hether *in fact* the Act will promote more environmentally desirable milk packaging," because the legislature "*could rationally have decided* that its ban on plastic nonreturnable milk jugs might foster greater use of environmentally desirable alternatives." *Id.* at 466.

The Second Circuit has not invalidated a statute as irrational based on changed circumstances.[5] And, in contrast to some circuit courts, the Second Circuit has not expressly embraced the view that changed circumstances may be considered as part of a rational basis review.[6] In accordance with the Supreme Court's holding in *Clover Leaf Creamery*, the Second Circuit has consistently held that a statute may not be invalidated because there is evidence that the legislature was mistaken. *See, e.g.*, *Buss. for a Better N.Y. v. Angelo*, 341 Fed. App'x 701, 704 (2d Cir. 2009) ("[W]hether *in fact* the [challenged statute] will accomplish its objectives is not the question: the Equal Protection Clause is satisfied if we conclude that the [state] Legislature *rationally could have believed* that the [action] would promote its objective." (quoting *W. & S. Life Ins. Co. v. State Bd. of Equalization*, 451 U.S. 648, 671-72 (1981))).

---

[5] Plaintiffs contend that *Quill v. Vacco*, 80 F.3d 716, 731 (2d Cir. 1996), *rev'd*, 521 U.S. 793 (1997) is to the contrary. In *Quill*, the Second Circuit invalidated under the Equal Protection Clause a New York statute that criminalized assisted suicide because it found no rational basis to distinguish that statute from New York law and practice that allows patients to refuse life-saving medical treatment. *Id.* at 727, 731. The case does not provide the support Plaintiffs seek because it does not relate to changed circumstances.

[6] For example, in *Dias v. City of Denver*, 567 F.3d 1167, 1183 (10th Cir. 2009) (footnote omitted), the Tenth Circuit reversed dismissal of a challenge to an ordinance banning pit bulls for reasons of public safety: "[P]laintiffs contend that although pit bull bans sustained twenty years ago may have been justified by the then-existing body of knowledge, the state of science in 2009 is such that the bans are no longer rational. This claim finds some support in the [breeding] standards themselves, to which the plaintiffs direct us." As Plaintiffs here note, the Second Circuit has not expressly ruled that courts may consider only circumstances at the time a law is enacted.

This Court need not decide whether changed circumstances are relevant: even assuming that the Court could consider the evolution of MMA's rules and safety record, the ban would satisfy rational basis scrutiny. As described herein, the Court finds that: (1) the law had a rational basis when passed in 1997, and (2) even if developments in MMA are relevant, the law continues to have a rational basis today.

### B. The Ban Had a Rational Basis when Enacted in 1997

To hold that a legislative action has a rational basis, a court "need only find some 'reasonably conceivable state of facts that could provide a rational basis' for the legislative action." *Beatie*, 123 F.3d at 712 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Courts must look for "plausible reasons" for legislative action "whether or not such reasons underlay the legislature's action." *Id.* (citation omitted). It is "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision because [the] Court has never insisted that a legislative body articulate its reasons for enacting a statute." *U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). Thus, a plaintiff who challenges a statute "must discredit any conceivable basis which could be advanced to support the challenged provision, regardless of whether that basis has a foundation in the record or actually motivated the legislature." *Beatie*, 123 F.3d at 713 (citation omitted).

The statute's legislative history reveals that supporters of the ban voiced two primary concerns: (1) professional MMA posed a threat to the health and safety of its participants, and (2) professional MMA was detrimental to public morality and had a negative influence on New York youth. (Compl. ¶¶ 31-36.) The legislature's effort to address either concern satisfies rational basis review.

### *1. The Legislature Considered MMA a Threat to Fighters' Health and Safety*

Plaintiffs argue that the law was irrational when enacted in 1997 because "the testimony of medical professionals before the state legislature indicated that boxing . . . was more dangerous than MMA." (*Id.* at ¶ 283.) The Court accepts as true that "then-existing medical studies showed that the rates of injury were low, and that even the injuries that were suffered were relatively minor."[7] (*Id.* at ¶ 78.) The Complaint also alleges that "[s]ince the time of the Ban's enactment . . . there has been ample medical and scientific evidence" to suggest other sports "are as or more dangerous" than MMA.[8] (*Id.* at ¶ 284.) For similar reasons, Plaintiffs argue that it was irrational to ban professional MMA but not MMA's "component martial arts" such as judo, tae kwon do, and karate. (*Id.* at ¶ 287.) Finally, they argue that it was irrational to ban professional contests but not amateur fights.[9] (*Id.* at ¶ 285.) Accepting the Complaint's factual allegations as true for the purposes of the instant motion, the Court finds them insufficient to conclude that the law lacked a rational basis when enacted.

First, it is well settled that "the Government has no obligation to produce evidence, or empirical data to sustain the rationality of a statutory classification." *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001) (internal quotations omitted). A legislature's decision "is not subject to courtroom factfinding and may be based on rational speculation unsupported by

---

[7] According to the Complaint, a study of twenty sports and athletic activities reportedly ranked "martial arts" as the "fifth *safest* among them, and one-twentieth as dangerous as football." (*Id.* at ¶ 78.) The Court is not in a position to evaluate whether martial arts, as defined in the study, is representative of MMA. But for the purpose of the motion to dismiss, the Court accepts as true that then-existing medical research suggested that MMA was a materially safer activity than football.

[8] The Complaint cites a 2008 study concluding that "[i]njury rates in regulated professional MMA competition are similar to other combat sports; the overall risk of critical sports-related injury seems to be low." (*Id.* at ¶ 91.)

[9] In adjudicating Defendants' limited motion to dismiss, the Court does not address Plaintiffs' contention in Count III that the ban is improperly vague about the permissibility of amateur MMA. (*See id.* at ¶¶ 255-75.)

evidence or empirical data." *Heller*, 509 U.S. at 320.  Here, the New York legislature had a sufficient basis to speculate that professional MMA posed a substantial threat to fighters' health and safety.  At the time of the law's enactment, MMA was in its infancy, and medical data about the sport was limited.  At the legislative hearings, at least one doctor testified that MMA competitions were unsafe because they lacked weight classes, protective gear, timed rounds, and sufficient restrictions on the fighters' hits and holds. (Compl. ¶ 72.)  Another expressed concern about the "choke holds" and "submission holds" permitted in MMA contests.  (*Id.* at ¶ 76.)  Plaintiffs argue this evidence supported MMA's regulation rather than its outright ban.  But courts will not strike down a law as irrational simply "because the problem could have been better addressed in some other way."  *Beatie*, 123 F.3d at 712.

Second, a rational basis for the statute can exist whether or not the medical testimony before the legislature suggested that MMA was more dangerous than boxing (or other combat and contact sports).  "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all."  *Jankowski-Burczyk v. I.N.S.*, 291 F.3d 172, 179 (2d Cir. 2002) (quoting *Ry. Express Agency, Inc. v. New York*, 336 U.S. 106, 110 (1949)).  Rather, legislatures are afforded "substantial latitude" to establish classifications that "roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill."  *Hayden*, 594 F.3d at 169 (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  Further, courts allow a legislature to "implement [its] program step by step, . . . adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *Clover Leaf Creamery*, 449 U.S. at 466 (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).  Thus, legislatures are deemed to have a rational basis for laws even when the

legislature "act[s] incrementally and . . . pass[es] laws that are over (and under) inclusive." *Hayden*, 594 F.3d at 171; *see also Vance*, 440 U.S. at 108 (allowing classifications that are "to some extent both underinclusive and overinclusive").

The New York legislature is not required to legislate uniform restrictions governing combat and contact sports.[10] It is well within the discretion of the legislature to enact a law addressing one sport today, while leaving legislation concerning others to another day.[11] For similar reasons, a legislature's decision to limit the reach of the law to *professional* MMA does not undermine the law's rational basis. A classification does not fail rational-basis review simply because it "roughly approximate[s] the nature of the problem perceived," *Hayden*, 594 F.3d at 169, or "because in practice it results in some inequality," *Heller*, 509 U.S. at 321 (internal quotations omitted). Plaintiffs' reliance on contemporary medical studies regarding MMA's safety record does not alter the analysis, because the Court accepts as true that then-existing medical studies suggested that MMA was not more dangerous than other sports. Moreover, even if there were conclusive evidence that the legislature misunderstood the safety

---

[10] Plaintiffs suggest that the ban's exemption for boxing (and component martial arts) requires an *independent* rational basis. (Pls.' Mem. 30-31.) Plaintiffs cite no controlling authority to support this proposition, and the Court is aware of none. But, even accepting as true that boxing and MMA cannot be distinguished on the basis of safety, the exemption for boxing could have a rational basis on account of its longevity. In *Dukes*, the Supreme Court upheld a New Orleans ordinance banning pushcart vendors in the French Quarter unless they had been in continuous operation for more than eight years. 427 U.S. at 305. In support of the distinction, the Court reasoned that the "city could reasonably decide that newer businesses were less likely to have built up substantial reliance interests in continued operation in the Vieux Carre." *Id.* Similar reasoning could support the distinction between MMA and a well-established sport like boxing. Unlike MMA, boxing has been regulated in New York for decades. It would not be unreasonable for New York's legislature to enact legislation restricting activities it considered unduly risky, but to limit those restrictions to activities in which individuals were less likely to suffer economic hardship.

[11] As Plaintiffs acknowledge, one doctor who testified at the 1996 hearings supported banning both MMA and boxing: "The [American Medical Association] and its journal have been opposed to boxing in all forms for the last thirteen years and have lobbied aggressively to have all types of boxing abolished in this country." (Pls.' Mem. 30.)

risks to MMA fighters, the Court could not invalidate the statute on the basis of a legislative mistake. *See Clover Leaf Creamery*, 449 U.S. at 464; *Buss. for a Better N.Y.*, 341 Fed. App'x at 704.

### 2. The Legislature Considered MMA an Affront to Public Morals and a Negative Influence on Youth

The defense of public morals can be a sufficient basis for upholding a law under the rational basis standard. *See, e.g.*, *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 567-68 (1991) (finding a public indecency statute was "clearly within the constitutional power of the State" given its "purpose of protecting societal order and morality"); *see also Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Public safety, public health, morality, peace and quiet, law and order-these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs."). Similarly, the Supreme Court has recognized that states have a legitimate interest in "protect[ing] the welfare of children and . . . see[ing] that they are safeguarded from abuses which might prevent their growth into free and independent well-developed men and citizens." *Ginsberg v. State of N.Y.*, 390 U.S. 629, 640-41 (1968) (internal quotations omitted). As the Court recently stated in *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2736 (2011) (citations omitted), there is "[n]o doubt a State possesses legitimate power to protect children from harm, but that does not include a free-floating power to restrict the ideas to which children may be exposed."[12]

The New York legislature could have rationally considered MMA a threat to public morals and a negative influence on its youth. In early MMA contests, promoters attracted viewers by emphasizing the risks faced by the fighters. (Compl. ¶ 23.) The bouts were sold as

---

[12] As noted, the Court does not address whether the ban is an unconstitutional restriction on expressive conduct for the purpose of entertaining Defendants' limited motion to dismiss.

13

"blood sport" and "fights to the death." (*Id.*) There is ample evidence to suggest that public morality featured prominently in the concerns of the legislature. Assemblyman Stephen Kaufman, who sponsored the Assembly bill, concluded that "[t]here is no public purpose served by these events" and that "[t]his neither serves the Public Good, nor increases the Public Weal." (*Id.* at ¶ 32.) Governor George Pataki, in signing the legislation, described the sport as "savage" and "barbaric." (*Id.* at ¶ 33.) Legislators were also concerned about the sport's potential impact on youth. Senator Roy Goodman, who sponsored the Senate bill, cautioned that "as bad as this is for the contestants participating in the contest, in my judgment, it has an even worse effect, and that is the abominable example which it sets for the youngsters of the coming generation." (*Id.* at ¶ 31.) Assemblyman Kaufman stated that MMA "increase[s] the susceptibility of our youth to violence and also desensitizes those same impressionable minds to needless brutality." (*Id.* at ¶ 32).

### C. The Ban Has a Rational Basis Today

Even if the Court were to consider changed circumstances, the law would satisfy rational basis scrutiny given the facts alleged in the Complaint. The Complaint alleges that "MMA today has a track record establishing it as safe as, if not more so than, many legal sporting events." (*Id.* at ¶ 90). Undoubtedly, the adoption of MMA's unified rules, in accordance with the regulations of other states, has reduced the health and safety risks to fighters. Promoters themselves have instituted regulations to further mitigate these risks. For example, prior to all UFC contests, competitors undergo medical testing, including blood tests, neurological examinations, brain scans, and eye exams. (*Id.* at ¶ 81). At least two Emergency Medical Technicians and two ringside doctors are present at every fight. (*Id.* at ¶ 82). The UFC has also instituted rules governing concussions, including mandatory waiting periods and doctor approvals to return to

competition.  (*Id.* at ¶ 88.)  The Court takes as true the assertion that "when it comes to serious injuries, MMA is as safe as or safer than, among other things, professional boxing, football, ice hockey, car racing, professional wrestling, equestrian sports, X-games, Alpine ski racing, motorcycle racing, and rodeos."  (*Id.* at ¶ 91.)

Event accepting these facts as true, the Court finds that the ban satisfies rational basis scrutiny.  As the Supreme Court has indicated, there is "no requirement" that "all evils of the same genus be eradicated or none at all."  *Ry. Express Agency*, 336 U.S. at 110.  Courts allow legislatures to implement programs "step by step" and to adopt regulations that "only partially ameliorate a perceived evil."  *Clover Leaf Creamery*, 449 U.S. at 466.  On the face of the Complaint itself, there are sufficient reasons to find that the risks to fighter health and safety warranted legislative action.  In the sport's limited existence, there have been two deaths in regulated MMA matches in the United States.[13]  (Compl. ¶ 92.)  Any long-term effects of head injuries sustained by MMA fighters necessarily remain uncertain.  These risks are sufficient to find that the legislature continues to have a rational basis to prohibit the live performance of professional MMA in New York.

### III. CONCLUSION

Plaintiffs have asked the Court to invalidate the ban because, they allege, MMA's safety concerns have been discredited and the sport itself has been reformed.  Indeed, 45 of 48 states with athletic commissions now allow it.  But if the evolution of MMA and the understanding of its risks have rendered the 1997 law unnecessary or unwise, Plaintiffs' proper recourse is with the legislature because the "Constitution presumes that, absent some reason to infer antipathy,

---

[13] The Complaint compares this statistic to a reported 27 deaths in professional boxing in the United States since 1993, (Compl. ¶ 92), but the significantly longer timeframe and the greater popularity of boxing during much of this period undermine the persuasiveness of this comparison.

even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely [a court] may think that a political branch has acted." *Beach Commc'ns*, 508 U.S. at 314 (quoting *Vance*, 440 U.S. at 97).

The Court GRANTS Defendants' motion to dismiss Counts IV and V.

The Court directs the parties to submit by August 31, 2012 a joint proposed schedule for resolving the remainder of this case.

SO ORDERED.

Dated: New York, New York
August 13, 2012

                                          KIMBA M. WOOD
                                          United States District Judge