UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
JON JONES, ET AL.,                          :
                                            :
                         Plaintiffs,        :
                                            :        No. 11 Civ. 8215 (KMW) (GWG)
            -against-                       :
                                            :        **Opinion & Order**
ERIC T. SCHNEIDERMAN, ET AL.                :
                                            :
                         Defendants.        :
-----------------------------------------------------X
Kimba M. Wood, U.S. District Judge

      Plaintiffs in this case, the leading promoter of professional mixed martial arts ("MMA")

and a group of professional and amateur MMA athletes, trainers, and fans (collectively,

"Plaintiffs"), challenge the constitutionality of a 1997 New York state law prohibiting the live

performance of professional MMA in New York (the "Combative Sport Ban" or the "Ban").

Defendants in this action are the New York State Attorney General ("NYAG") and the New

York County District Attorney (collectively, "Defendants").

      The Court previously granted Defendants' motion to dismiss certain counts asserted in

Plaintiffs' original complaint.  See Jones v. Schneiderman, 888 F. Supp. 2d 421 (S.D.N.Y. 2012)

(Wood, J.).  Since then, Plaintiffs have filed a First Amended Complaint ("FAC").  [Dkt. No.

34].  In the FAC, Plaintiffs argue that the Ban is invalid because the law: (1) violates Plaintiffs'

First Amendment rights of expression; (2) is overbroad on its face, in violation of the First

Amendment; (3) is unconstitutionally vague, in violation of the Due Process Clause; (4) violates

the Equal Protection Clause; (5) lacks a rational basis, in violation of the Due Process Clause;

and (6) violates the Commerce Clause.  Plaintiffs also contend that a separate 2001 liquor law

violates their First Amendment rights of expression.  Presently before the Court is Defendants'

motion to dismiss the FAC.  [Dkt. No. 36].

For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.  In particular, the Court dismisses each of Plaintiffs' causes of action except for Plaintiffs' as-applied vagueness challenge.

## I.      FACTUAL BACKGROUND

### A.      The Plaintiffs

Plaintiffs represent all aspects of amateur and professional MMA.  Plaintiff Zuffa, LLC does business as the Ultimate Fighting Championship ("UFC"), "the leading promoter of live Professional Unified Rules MMA contests and exhibitions throughout the world."  (FAC ¶ 278).

A number of professional MMA fighters are named as Plaintiffs, including: Jon "Bones" Jones, the current UFC Light Heavyweight champion and youngest titleholder in UFC history, (FAC ¶ 257); Gina "Conviction" Carano, often referred to as the "Face of Women's MMA," (FAC ¶ 261); Frankie "The Answer" Edgar, a former UFC Lightweight champion, (FAC ¶ 265); Matt "The Hammer" Hamill, a recently retired UFC fighter who is congenitally deaf, (FAC ¶¶ 269-71); Brian "All American" Stann, a military veteran, Silver Star recipient, active UFC fighter, and President of Hire Heroes USA, a non-profit organization that helps military veterans obtain employment and transition back to civilian life, (FAC ¶¶ 275, 273); and Jennifer Santiago, an MMA fighter in the World Combat League, founded by Chuck Norris, (FAC ¶¶ 342, 344).

In addition to professional fighters, Plaintiffs include a number of amateurs and MMA enthusiasts.  Danielle Hobeika is an MMA follower and amateur fighter currently living in New York.  (FAC ¶ 299).  Joseph Lozito has been a fan of MMA since 1993 and enjoys watching live professional MMA.  (FAC ¶¶ 323, 326-27).  Chris Reitz is a longtime MMA supporter who wants to compete in amateur MMA in New York, but is uncertain as to whether he is permitted

to do so.  (FAC ¶¶ 336, 341).  Beth and Donna Hurrle are the founders and editors of *Gals Guide to MMA*, "an MMA website by, and for, women."  (FAC ¶ 306).

Plaintiffs also include a number of amateur MMA trainers and promoters.  Steve Kardian is an MMA instructor and co-founder of Thornwood MMA and Fitness School in Westchester, New York.  (FAC ¶ 316).  Erik Owings is an MMA trainer and owner of Mushin Mixed Martial Arts academy in New York City.  (FAC ¶¶ 331, 335).  Don Lilly is an MMA promoter, a manager of professional and amateur MMA fighters, and an owner of an MMA gym in New York.  (FAC ¶ 281).  On May 19, 2012, Lilly organized an amateur MMA event in North Tonawanda, New York, which was attended by over 1,000 people.  (FAC ¶¶ 283, 285).  Shannon Miller is a former professional boxer and boxing promoter.  (FAC ¶ 289).  He currently produces amateur MMA events in New York through 5Guys Fighting.  (Id.).  In 2009, Miller had planned to hold an amateur Muay Thai and kickboxing event at the State University of Albany; a UFC fighter was scheduled to appear at the event, although not to compete.  (FAC ¶ 292).  The New York State Athletic Commission (the "SAC"), however, citing the "professional" appearance of the posters used to promote the event, shut down the event.  (Id.).

### B.       The Origins of MMA

MMA traces its historical origins to 648 B.C. and the ancient Olympic sport of "pankration," which combined "boxing, wrestling, and fighting with the feet."  (FAC ¶ 22). Modern MMA, in turn, dates back roughly 80 years to the Brazilian martial art of "vale tudo," that artists such as Rorion Gracie and the Gracie family developed into Brazilian jiu-jitsu, "a ground-based system of fighting that utilizes submission and grappling techniques."  (FAC ¶ 26). In 1993, competitors from a variety of martial arts disciplines, including kickboxing, karate, sumo, boxing, and jiu-jitsu, participated in a tournament in Denver, Colorado.  (FAC ¶ 27).

Royce Gracia, brother of Rorion Gracie and one of the smallest fighters in the tournament, ultimately prevailed, and catapulted Brazilian jiu-jitsu to worldwide recognition.  (FAC ¶ 28).  MMA soon experienced a meteoric rise in popularity.  (FAC ¶ 3).

Early MMA tournaments attracted interest by advertising the sport's violence and its risk to fighters.  (FAC ¶ 27).  In what Plaintiffs acknowledge was an "ill-advised marketing strategy," fights were sold as "no holds barred" contests in which "There Are No Rules!"  (FAC ¶ 30).  As one MMA advertisement promised, "[e]ach match will run until there is a designated winner—by means of knock-out, surrender, doctor's intervention, or *death*."  (Id.).

### C.     New York's Combative Sport Ban

As MMA gained popularity, many states began considering bans on the sport.  In 1996, the New York Legislature held hearings on the question "Should New York Ban Extreme Fighting?"  (FAC ¶ 42 n.17).  At the hearings, representatives from leading MMA promoters testified about MMA's rules, and medical experts testified about the risks that the sport posed to fighters' safety.  (FAC ¶¶ 83-90).  Legislators who supported a ban voiced two primary concerns: (1) MMA fights posed a health and safety risk to fighters, and (2) MMA fights undermined public morals and had a negative influence on New York youths.  (FAC ¶¶ 38-43).

In 1997, the legislature enacted the Combative Sport Ban, which prohibits any "combative sport" within the state of New York.  The Ban defines a "combative sport" as "any professional match or exhibition" in which participants may deliver "kicks, punches or blows of any kind to the body of an opponent," but excludes boxing, wrestling, and certain "martial arts" (including judo, karate, and tae kwon do).  N.Y. Unconsol. Laws § 8905-a(1).  The legislation

effectively bans live, professional MMA in New York by prohibiting the State Athletic

Commission ("SAC") from approving licenses for such matches or exhibitions.  Id. § 8905-a(2).[1]

---

[1] The full text of the Combative Sport Ban, N.Y. Unconsol. Laws § 8905-a, is as follows:

\
1. A "combative sport" shall mean any professional match or exhibition other than boxing, sparring, wrestling or martial arts wherein the contestants deliver, or are not forbidden by the applicable rules thereof from delivering kicks, punches or blows of any kind to the body of an opponent or opponents. For the purposes of this section, the term "martial arts" shall include any professional match or exhibition sanctioned by any of the following organizations: U.S. Judo Association, U.S. Judo, Inc., U.S. Judo Federation, U.S. Tae Kwon Do Union, North American Sport Karate Association, U.S.A. Karate Foundation, U.S. Karate, Inc., World Karate Association, Professional Karate Association, Karate International, International Kenpo Association, or World Wide Kenpo Association. The commission is authorized to promulgate regulations which would establish a process to allow for the inclusion or removal of martial arts organizations from the above list. Such process shall include but not be limited to consideration of the following factors:

(a) is the organization's primary purpose to provide instruction in self defense techniques;

(b) does the organization require the use of hand, feet and groin protection during any competition or bout; and

(c) does the organization have an established set of rules that require the immediate termination of any competition or bout when any participant has received severe punishment or is in danger of suffering serious physical injury.

2. No combative sport shall be conducted, held or given within the state of New York, and no licenses may be approved by the commission for such matches or exhibitions.

3. (a) A person who knowingly advances or profits from a combative sport activity shall be guilty of a class A misdemeanor, and shall be guilty of a class E felony if he or she has been convicted in the previous five years of violating this subdivision.

(b) A person advances a combative sport activity when, acting other than as a spectator, he or she engages in conduct which materially aids any combative sport. Such conduct includes but is not limited to conduct directed toward the creation, establishment or performance of a combative sport, toward the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor, toward the solicitation or inducement of persons to attend or participate therein, toward the actual conduct of the performance thereof, toward the arrangement of any of its financial or promotional phases, or toward any other phase of a combative sport. One advances a combative sport activity when, having substantial proprietary or other authoritative control over premises being used with his or her knowledge for purposes of a combative sport activity, he or she permits such to occur or continue or makes no effort to prevent its occurrence or continuation.

(c) A person profits from a combative sport activity when he or she accepts or receives money or other property with intent to participate in the proceeds of a combative sport activity, or pursuant to an agreement or understanding with any person whereby he or she participates or is to participate in the proceeds of a combative sport activity.

(d) Any person who knowingly advances or profits from a combative sport activity shall also be subject to a civil penalty not to exceed for the first violation ten thousand dollars or twice the amount of gain derived therefrom whichever is greater, or for a subsequent violation twenty thousand dollars or twice the amount of gain derived therefrom whichever is greater. The attorney general is hereby empowered to commence judicial proceedings to recover such penalties and to obtain injunctive relief to enforce the provisions of this section.

### D.    The Evolution of Modern MMA

In the years since New York implemented the Combative Sport Ban, fan interest in MMA has dramatically increased.  MMA training and promotion have changed as well. Modern, professional MMA fighters now train in various martial and combat arts, including karate, jiu-jitsu, boxing, kickboxing, grappling, judo, Muay Thai, and wrestling.  (FAC ¶ 1). Fighters may strike their opponents while standing or grappling on the ground.  (FAC ¶ 46).  In the UFC, fights are typically staged inside "the Octagon," an eight-sided padded-floor platform surrounded by a chain-link fence.  (FAC ¶ 47).  Because the Octagon resembles a cage, MMA is sometimes colloquially referred to as "cage fighting."  (Id.).

Modern MMA within the UFC is quite different from the "no holds barred" tournaments of the early 1990s.  In 1997, fighters began competing in weight classes.  In 1999, the UFC and other promoters implemented five-minute rounds, between which fighters receive medical treatment.  New rules also prohibit groin strikes, head butts, joint manipulation, kicking a downed opponent, or strikes to the back of the neck or head.  (FAC ¶ 48).

In 2000, the New Jersey State Athletic Control Board sanctioned an MMA fight under its Unified Rules of MMA.  (FAC ¶ 49).  The following year, New Jersey became the first state to formally authorize MMA.  (FAC ¶ 50).  Nevada soon followed, largely adopting New Jersey's Unified Rules.  (Id.).  Today, 46 states have chosen to regulate, rather than prohibit, MMA, with most states adopting the Unified Rules.  (FAC ¶¶ 50, 52).  MMA is now one of the fastest growing spectator sports in the United States.  Fights are regularly broadcast on network and pay-per-view television, and Plaintiffs estimate that the UFC reaches five hundred million homes worldwide.  (FAC ¶ 1).

Despite these developments, efforts to convince the New York legislature to overturn the Ban have repeatedly failed.  (FAC ¶¶ 6, 74.)

###### E.     MMA's Message

Plaintiffs describe, at great length, the "messages" conveyed by professional MMA. They state that, in addition to a desire for fame and fortune, MMA fighters compete to showcase their training, technique, discipline, courage, and determination.  (FAC ¶¶ 210-12).  The movements involved in MMA—the strikes, holds, and maneuvers—are practiced at length, honed, and carefully executed.  (FAC ¶ 213; see also ¶ 215 (discussing the Marine Corps' use of MMA training)).  The best moves and techniques are proven through competition.  (FAC ¶ 216; see also ¶ 224 ("Watch mixed martial arts, the true marketplace of ideas." (quoting David Mamet, Ultimate Fighting: The Final Frontier, The Observer, Sept. 30, 2007))).  Plaintiffs state that there is no animosity or anger between opponents.  (FAC ¶ 217).  To the contrary, fighters develop a mutual respect for one another and view a match as an opportunity to test one's self and one's training.  (FAC ¶¶ 218-19).

In the context of live professional MMA, Plaintiffs contend that fighters are both athletes and performers.  (FAC ¶ 221 ("Live Professional MMA matches provide fighters with myriad expressive outlets, allowing fighters to build relationships with their fans and tell the world their story.")).  The message of live MMA begins before the fighters enter the arena and continues throughout the fight.  Fighters have backstories and "personas" that are highlighted by pre-fight advertising, on display during the fighter's entrance into the arena (the "walkout"), and carried into the fight itself.[2]  (FAC ¶¶ 225-31).  Personalized theme music and "carefully selected attire" are also on display before and during the fight.  (FAC ¶ 232).

---

[2] The FAC alleges facts relating to the fighter Plaintiffs.  (See, e.g., FAC ¶ 259 ("In the way he performs in fights and carries himself generally, [Plaintiff] Jones strives to send the messages of faith, self-confidence, and self

The FAC further alleges that fans of professional MMA "learn, understand, and respond to the technical aspect of MMA.  They understand that the strikes, holds, and moves are carefully planned and executed."  (FAC ¶ 240).  The FAC alleges that MMA does not draw fans with violence, but rather with athleticism, skill, and display of contrasting styles of fighting.  (FAC ¶ 245).  Certain fans "also identify with the personal stories of particular Professional MMA fighters."  (FAC ¶ 242).  The fan experience is amplified by experiencing an MMA event live. (FAC ¶¶ 248-52).

### F.     New York's Enforcement of the Combative Sport Ban

Plaintiffs contend that since the Ban has been in force, New York State officials, including the SAC, have interpreted and enforced the Ban in a variety of conflicting manners. From its enactment in 1997 until 2002, combative sports—including kickboxing and MMA— flourished in New York.  (FAC ¶¶ 163, 185).  Plaintiffs allege not only that amateur and professional MMA events were common, but also that SAC members attended these events. (FAC ¶ 163).  According to Plaintiffs, the SAC in these early years appeared to prohibit only UFC-sponsored professional MMA.  (Id.).

In 2002, however, the SAC began to shut down both professional and *amateur* combative sports events.  (FAC ¶¶ 166, 186).  As a result, all professional MMA events and most amateur MMA events disappeared from New York.  (FAC ¶¶ 166-67; see also ¶ 169 ("Paid or unpaid, and regardless of whether alcohol is served, [MMA] exhibitions and matches are illegal in the state of New York." (quoting New York State Department statement to the Wall Street Journal))).  SAC members and staff further insisted that they would shut down any amateur MMA that remained in the state.  (FAC ¶¶ 167-68 (quoting SAC members who promised to shut

---

esteem to his fans. . . . He fights to convey to his fans that their dreams can come true if they work hard and do their best."); ¶ 264 ("[Plaintiff] Carano performs MMA live because it allows her to connect with other fights, as well as with outsiders, and send a message about the strength and determination of women to succeed.")).

down underground MMA events if they found out about them).  Plaintiffs also allege that during this period, under the provisions of a separate law (the "2001 Liquor Law"), the New York State Liquor Authority threatened to revoke the liquor licenses of venues that served alcohol while combative sport activities were taking place.  (FAC ¶ 166).

While the SAC was cracking down on MMA, other combative sports, including kickboxing, began to take place in New York with the SAC's approval.  This was permitted by an exemption from the Ban that excludes martial arts sanctioned by various organizations, including the World Karate Association ("WKA"), from the definition of combative sports. (FAC ¶¶ 190-91); see also N.Y. Unconsol. Laws § 8905-a(1).  Allegedly, no other organization has been permitted to promote combative sports activities.  (FAC ¶¶ 17-18, 196).

Plaintiffs also allege that, in response to this litigation, the SAC and the NYAG now assert that amateur MMA is not covered by the Ban.  (FAC ¶¶ 14-15, 161-62, 293, 420; see also ¶¶ 172-72 (discussing Plaintiff Lilly's amateur MMA event in May 2012); ¶¶ 293-95 (alleging that Cage Wars XIII took place in August 2012 with approval of SAC Chair Melvina Lathan)).

## II.   MOTION TO DISMISS LEGAL STANDARD

As noted above, in the FAC Plaintiffs assert seven causes of action—six with respect to the Combative Sport Ban, and one with respect to the 2001 Liquor Law.  Defendants have moved, pursuant to Federal Rules of Civil Procedure 12(b)(6), to dismiss the FAC and to declare both statutes constitutional.[3]  In order to survive a Rule 12(b)(6) motion, the FAC "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted).  Although the Court draws all reasonable

---

[3] Defendants' motion references Rule 12(b)(1), but does not raise jurisdictional arguments and instead challenges the legal sufficiency of the Plaintiffs' claims under Rule 12(b)(6).

inferences in Plaintiffs' favor, the Court is not bound to accept a legal conclusion couched as a factual allegation.  Id. (citing Twombly, 550 U.S. at 555).

### III.    FIRST AMENDMENT EXPRESSIVE CONDUCT

Plaintiffs' first cause of action contends that by prohibiting professional MMA matches and exhibitions—what Plaintiffs refer to as "live performance MMA"—New York's Combative Sport Ban violates the First Amendment to the United States Constitution.  The Court disagrees, and for the reasons that follow, the Court concludes that Plaintiffs fail to state a cognizable claim, and accordingly dismisses Plaintiffs' First Amendment claim.

### A.    Legal Principles

In order to show that New York's ban on professional MMA violates the First Amendment, Plaintiffs must establish that their actions "constitute 'expressive conduct' entitled to protection under the First Amendment, as incorporated by the Fourteenth [Amendment,]" and that New York's regulation "impermissibly denies . . . such protection."  Zalewska v. Cnty. of Sullivan, N.Y., 316 F.3d 314, 319 (2d Cir. 2003) (citing Texas v. Johnson, 491 U.S. 397, 403 (1989)).  The Parties sharply disagree as to whether professional MMA qualifies as "expressive conduct."  Before making this determination, the Court reviews the relevant legal principles.

"It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'"  Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting Virginia v. Black, 538 U.S. 343, 358 (2003)).  It is equally clear, however, that "not all conduct may be viewed as speech simply because by her conduct the actor intends to express an idea."  Zalewska, 316 F.3d at 319 (citing Spence v. Washington, 418 U.S. 405, 409 (1974)); see also United States v. O'Brien, 391 U.S. 367, 376

(1968) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends . . . to express an idea.").

For conduct to be entitled to constitutional protection, it must be "sufficiently imbued with the elements of communication," Johnson, 491 U.S. at 404, which requires, "at the very least, [1] an intent to convey a 'particularized message' along with [2] a great likelihood that the message will be understood by those viewing it." Zalewska, 316 F.3d at 319 (quoting Hurley v. Irish Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 569 (1995)).  Accordingly, although an actor's subjective intent is an important consideration, "there is an objective component that requires consideration of whether, under the circumstances, the particular conduct is likely to be understood or perceived as expressing a particular message." Grzywna ex rel. Doe v. Schenectady Cent. Sch. Dist., 489 F. Supp. 2d 139, 146 (N.D.N.Y. 2006).  "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies, and that party must advance more than a mere 'plausible contention' that its conduct is expressive." Church of Am. Knights, 356 F.3d at 205 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 n.5 (1984))

> **B.** **Professional MMA Matches and Exhibitions Are Not Protected By the First Amendment**

Live-performance, professional MMA qualifies as expressive conduct only if Plaintiffs establish that MMA is "sufficiently imbued with the elements of communication." Johnson, 491 U.S. at 404; see also Zalewska, 316 F.3d at 319.  Applying the legal principles discussed above, the Court finds that live-performance MMA does not qualify for First Amendment protection. Although the Court recognizes that Plaintiffs have alleged that they intend to communicate a particularized message, the Court concludes that Plaintiffs have not demonstrated a "great likelihood" that viewers will understand that message.

> **i.**      *Plaintiffs Have Sufficiently Alleged that Live, Professional MMA Intends to Communicate a Particularized Message*

Plaintiffs discuss, at length, the alleged artistic, technical, and personal messages that professional, live-performance MMA intends to convey.  (See FAC ¶¶ 208-56).  Plaintiffs explain that fighters seek "to communicate thoughts and feelings about, among other things, beauty, creativity, courage, skill, humor, speed, power, excellence, and grace to their audience." (Pls.' Mem. 17).  Plaintiffs describe public fights as a "chance to demonstrate to those watching their hard-won skill and technique, discipline, their courage, and their determination to win." (FAC ¶¶ 211, 220).  Plaintiffs also allege that live-performance MMA "allow[s] fighters to build relationships with their fans and tell the world their story."  (FAC ¶ 221; see also FAC ¶ 225 (discussing MMA fighters' "personas that they carry into the fight"); ¶¶ 226-34 (discussing the process leading up to fights, from pre-fight video blogs to the walkout); ¶¶ 235-38 (discussing post-match interviews and displays)).  As a result, MMA followers "identify with the personal stories of particular Professional MMA fighters."  (FAC ¶ 242).

The Supreme Court has explained that, when evaluating whether a speaker intends to convey a "particularized message," courts should not require the speaker to "edit [his or her] themes to isolate an exact message as the exclusive subject matter of the speech."  Hurley, 515 U.S. at 569-70.  Thus, accepting Plaintiffs' allegations as true for purposes of Defendants' motion, see Iqbal, 556 U.S. at 678, the Court will assume that professional MMA fighters *intend* to convey a particularized message.

> **ii.**     *Plaintiffs Have Not Established a Great Likelihood That Their Message Will Be Understood By Those Viewing It*

Even assuming that MMA fighters intend to convey a particularized message, the Court is not convinced that there is a great likelihood that the particularized message will be understood by those viewing it.  See Zalewska, 316 F.3d at 319.

Without making an "esthetic [or] moral judgment[]" regarding MMA, see Brown v. Entm't Merchs. Ass'n, 131 S. Ct. 2729, 2733 (2011), the Court concludes that the nature of professional MMA is such that the audience is not likely to receive the particularized artistic, technical, and personal messages that Plaintiffs allege MMA fighters *intend* to convey.  See Part III.B.i.  Although Plaintiffs allege that MMA fans "learn, understand, and respond to the technical aspect of MMA"; "appreciate the artistry displayed by the fighters"; and "identify with the personal stories of particular Professional MMA fighters," (FAC ¶¶ 240, 242), the Court concludes that Plaintiffs have not carried their burden of demonstrating "more than a mere 'plausible contention'" that viewers are likely to perceive live, professional MMA as conveying the alleged expressive messages.  See Church of Am. Knights, 356 F.3d at 205; see also Zalewska, 316 F.3d at 319.

Professional MMA, like other sports, is competitive conduct defined by who wins and who loses.  The goal of an MMA fight is to secure a victory by knockout, verbal tap out, referee stoppage, or referee majority decision.  Such competitive conduct stands in sharp contrast to the public performances that courts have found communicate an expressive message.  See, e.g., Hurley, 515 U.S. at 568 (noting protected status of parades, the "painting of Jackson Pollack, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll"); Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65-66 (1981) ("musical and dramatic works");[4] Cockrel v. Shelby

---

[4] In Schad v. Borough of Mount Ephraim, the Supreme Court considered a total ban on "live entertainment," including "nude dancing."  452 U.S. at 65.  The Court explained that the ban at issue "prohibit[ed] a wide range of [protected] expression," including "motion pictures, programs broadcast by radio and television, and

Cnty. Sch. Dist., 270 F.3d 1036, 1049 (6th Cir. 2001) (films or stage plays); see also Ward v.

Rock Against Racism, 491 U.S. 781, 790 (1989) (music); Southeastern Promotions, Ltd. v.

Conrad, 420 U.S. 546, 557-58 (1975) (the musical "Hair"); Joseph Burstyn, Inc. v. Wilson, 343

U.S. 495, 501 (1952) (motion pictures).  Accordingly, courts have "generally been unwilling to

extend First Amendment protection to sports or athletics."  Maloney v. Cuomo, 470 F. Supp. 2d

205, 213 (E.D.N.Y. 2007), aff'd, 554 F.3d 56 (2d Cir. 2009).[5]

    This conclusion is not altered by Plaintiffs' allegations regarding the contrasting martial

arts styles and techniques that professional fighters exhibit in every MMA match or exhibition.

All organized competition routinely involves contrasting styles, techniques, and strategy; when

---

live entertainment, such as musical and dramatic works," id. at 65-66, but did not categorically hold that all "live
entertainment" qualifies for First Amendment protection.

    [5] See, e.g., Equity in Athletics, Inc. v. Dep't of Educ., 504 F. Supp. 2d 88, 91 (W.D. Va. 2007) (rejecting
First Amendment challenge to elimination of archery, cross country, track, swimming, and wrestling teams), aff'd,
291 F. App'x 517 (4th Cir. 2008); Fighting Finest, Inc. v. Bratton, 898 F. Supp. 192, 195 (S.D.N.Y. 1995) (Sand, J.)
("While we recognize that dance, when combined with nudity, can inexorably convey a message of eroticism, we
are not convinced that a boxing match, in which police officers participate, inexorably conveys any message other
than that police officers can be pugilists." (citation omitted)), aff'd on other grounds, 95 F.3d 224 (2d Cir. 1996);
Justice v. Nat'l Collegiate Athletic Ass'n, 577 F. Supp. 356, 374 (D. Ariz. 1983) ("Intercollegiate football . . . is
primarily a conduct-oriented activity; as such, it is not entitled to the same First Amendment protection that other
more "communicative" forms of entertainment have been afforded."); Top Rank, Inc. v. Fla. State Boxing Comm'n,
837 So.2d 496, 498 (Fla. Dist. Ct. App. 2003) ("We determine that a boxing match does not constitute either pure or
symbolic speech and decline to extend First Amendment protection to the promoters of a boxing match."); Sunset
Amusement Co. v. Bd.of Police Comm'rs of L.A., 496 P.2d 840, 845-46 (Cal. 1972) ("We have difficulty finding
that essential element [of communication] to exist in the context of a roller skating rink. True, it is inevitable that
some patrons of the rink watch the other skaters and are, perhaps, entertained or amused by their activities. And yet
it seems inescapable that petitioners' patrons primarily use the facilities for physical exercise and personal
pleasure.").
    Plaintiffs' authority to the contrary is largely inapposite.  In Five Borough Bicycle Club v. City of New
York, the court explained that although the act of riding a bicycle is typically "unrelated to expression," mass
organized bicycle rides can "express the idea that there are viable and environmentally friendly alternatives to cars."
483 F. Supp. 2d 351, 368 (S.D.N.Y. 2007) (Kaplan, J.), aff'd on other grounds, 308 F. App'x 511 (2d Cir. 2009).
This holding, however, by no means suggests that competitive cycling qualifies for First Amendment protection.
Post Newsweek Stations-Connecticut, Inc. v. Travelers Ins. Co., on which Plaintiffs also rely, offers similarly
limited support.  In that case, the Court stated that "the entertainment here [figure skating] is the exposition of an
athletic exercise. As such, it is *on the periphery of protected speech* (for purposes of a balancing of conflicting
interests), as opposed, for example, to political speech, which is at the core of first amendment protection." 510 F.
Supp. 81, 86 (D. Conn. 1981) (emphasis added).  After noting this minimal degree of protection, the court actually
*denied* the plaintiffs request for a preliminary injunction.
    The Court does not intend to suggest—as Defendants argue—that competitive sports can *never* receive
First Amendment protection.  As discussed above, music, dance, and theatrical performance are routinely considered
protected conduct; elements of these activities are present in a variety of competitive Olympic sports, including
figure skating, synchronized swimming, and gymnastics.  Accordingly, there may be an argument that such sports
deserve greater First Amendment protection; but that is not this case.

one side wins, that victory will, in some sense, "speak" to which techniques and strategy are superior.  For example, to the trained eye, a chess player's decision to respond to the Ruy Lopez with the Schliemann Defense rather than the Classical Defense may convey some information about the player's aggressiveness and strategy; similarly, a professional Ultimate Frisbee player's decision to throw an outside-in forehand, rather than a hammer, may express a position on a preferred tactic or strategy.  In fact, one can make the same claim for any intentional choice made in the presence of another person.  If such a "message" were sufficient to trigger constitutional protection, the line between conduct and speech would be meaningless.  See City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall— . . . such a kernel is not sufficient to bring the activity within the protection of the First Amendment.").

Of course, this is not to say that professional chess, disc sports, or MMA do not require an immense degree of skill, training, and talent; this is beyond doubt.  But the First Amendment does not protect all conduct that involves impressive skill.  The central question is whether the activity is primarily communicative and expressive.  See, e.g., Tinker v. Des Moines Sch. Dist., 393 U.S. 503 (1969) (wearing black armband in a public school as protest against U.S. policy in Vietnam); Brown v. Louisiana, 383 U.S. 131 (1966) (student sit-ins in "whites only" library to protest segregation); Stromberg v. California, 283 U.S. 359 (1931) (flying a red flag in support of communism).  Music, dance, and theatrical performance are protected because, whether amateur or professional, slap-stick or high-society, such activities are primarily intended to

express a message to the viewer.  Live professional MMA, by contrast, lacks such essential

communicative elements.[6]

>            iii.            *Live MMA is Not Inherently Expressive*

Distinct from the established two-part test for determining whether conduct qualifies for

First Amendment protection, Plaintiffs argue that although "the mere act of doing MMA is not

itself expressive conduct," professional MMA matches and exhibitions *inherently* qualify for

First Amendment protection because the conduct *entertains a live audience*.  (See Pls.' Mem.

11).  The Court rejects this position.  Neither the fact that conduct "entertains," nor the fact that

conduct is performed before a live audience necessarily means that the conduct is sufficiently

imbued with elements of communication to qualify for First Amendment protection.[7]

---

[6] The fighters' pre-fight and post-fight antics do not change the Court's conclusion that the core conduct at issue—live MMA combat between professionals—does not qualify for First Amendment protection.  See Rumsfeld v. Forum for Academic & Institutional Rights, Inc., 547 U.S. 47, 66 (2006) ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into "speech" simply by talking about it.").  The primary conduct target by the Ban is professional MMA and conduct that materially aids a specific phase of an MMA event. N.Y. Unconsol. Law. 8905-a.  It is this conduct, not the surrounding fanfare, that must convey the particularized message that the audience is likely to receive.  See Young v. N.Y.C. Transit Auth., 903 F.2d 146, 153-54 (2d Cir. 1990) (holding that the essential act of begging—extending one's hand asking for money—did not express a particularized message likely to be understood by those viewing it); see also Stanglin, 490 U.S. at 25 (holding that the activity of recreational dance-hall patrons, although entertaining and accompanied by music, is not protected by the First Amendment).

[7] To accept Plaintiffs' position—that conduct "done to engage or entertain an audience" is automatically protected—would subsume nearly every intentional act done in the presence of another person; it is difficult to imagine "entertaining" conduct that categorically is not intended to amuse or please.  See Black's Law Dictionary (9th ed. 2009) (defining "entertain" as "to amuse or please").  Accordingly, the Supreme Court has never adopted a "live performance" or "entertainment" test for expressive conduct, but instead has consistently protected only those activities sufficiently imbued with elements of communication.  See Spence, 418 U.S. at 409; see also Stanglin, 490 U.S. at 25 (holding that recreational dancing by dance hall patrons, although presumably entertaining, was not protected by the First Amendment).

Moreover, the fact that the Ban prohibits certain public conduct, such as matches and exhibitions, does not change this analysis.  It has never been the case that unprotected conduct becomes protected merely because it occurs in public.  For example, although the Supreme Court has suggested that "nude dancing" may fall "within the outer ambit of the First Amendment's protection," City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000), courts have held that engaging in public sexual conduct is not protected, e.g., Connection Distrib. Co. v. Reno, 154 F.3d 281, 289 n.8 (6th Cir. 1998) ("[T]he First Amendment also would not protect the right to engage in the depicted sexual conduct publicly under the theory that the sexual act itself constitutes protected expression." (citing Paris Adult Theatre I v. Slaton, 413 U.S. 49, 67 (1973))); O'Connor v. City & Cnty. of Denver, 894 F.2d 1210, 1218 (10th Cir. 1990) ("[P]articipation in public sex acts is not commonly associated with any constitutionally protected expression.").

Accordingly, the Court concludes that New York's ban on professional MMA does not implicate First Amendment concerns. Plaintiffs' First Amendment claim is therefore dismissed.

## IV.   FIRST AMENDMENT OVERBREADTH

Plaintiffs next argue that the Ban is unconstitutionally overbroad because it "prohibits myriad other forms of speech and expression that are protected by the First Amendment." (FAC ¶ 364). Plaintiffs allege that there is a long list of presumably protected activity that "appears" to be prohibited by the Ban, including: writing to State officials to ask them to overturn the Ban; lecturing regarding MMA's impact on modern culture; producing videos of out-of-state MMA bouts in New York; MMA "viewing parties"; a newspaper writer urging readers to watch and attend professional MMA; and even litigating this lawsuit. (FAC ¶ 370). Defendants counter that the Ban does not reach protected speech, but rather merely prohibits "physical or financial conduct promoting banned events, rather than abstract advocacy such as lobbying, lectures, articles, or 'this lawsuit.'" (Defs.' Mem. 25).

### A.   Overbreadth Legal Standards

Although the Court has determined that professional MMA does not qualify as protected speech, see supra Part III, Plaintiffs may nonetheless assert a First Amendment overbreadth challenge. See Broadrick v. Oklahoma, 413 U.S. 601, 612 (1973); see also Board of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 483 (1989) ("Ordinarily, the principal advantage of the overbreadth doctrine for a litigant is that it enables him to benefit from the statute's unlawful application to someone else."). To state a claim for overbreadth, Plaintiffs must show that, although the Ban did not violate their First Amendment rights, "it would violate the First Amendment rights of hypothetical third parties if applied to them." Farrell v. Burke, 449 F.3d 470, 498 (2d Cir. 2006).

A law is unconstitutionally overbroad if it "punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep."  Virginia v. Hicks, 539 U.S. 113, 118-19 (2003) (internal quotation marks omitted).  Before a court will invalidate a law as overbroad, the challenging party must demonstrate "*substantial*" infringement of speech.  United States v. Williams, 553 U.S. 285, 292 (2008); see also Adams v. Zenas Zelotes, Esq., 606 F.3d 34, 38 (2d Cir. 2010) (explaining that overbreadth must be substantial, "not only in an absolute sense, but also relative to the statute's plainly legitimate sweep").  "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers."  Williams, 553 U.S. at 293.  The second step is to determine whether the law, as construed, "criminalizes a substantial amount of protected expressive activity."  Id. at 297.

**B.      New York's Combative Sport Ban is Not Unconstitutionally Overbroad**

Subject to certain enumerated exceptions, section 8905-a(3)(a) bans "any professional match or exhibition . . . wherein the contestants deliver, or are not forbidden by the applicable rules thereof from delivering kicks, punches or blows of any kind to the body of an opponent or opponents."  N.Y. Unconsol. Laws § 8905-a(1)-(2).  This provision is clearly the core of the Ban, and the Court has already determined that the Ban—as applied to professional live-performance MMA—does not implicate First Amendment concerns.

Next, the Ban extends to any person who "*knowingly advances* or *profits from* a combative sport activity."  Id. § 8905-a(3)(a) (emphasis added).  A person *profits from* a combative sport activity by accepting or receiving money or other property "with intent to participate in the proceeds of a combative sport activity," or by "participat[ing] . . . in the proceeds of a combative sport activity."  Id. § 8905-a(3)(b).  A person *advances* a combative

sport activity when, "acting other than as a spectator, he or she engages in conduct which materially aids any combative sport." Id. (emphasis added).  According to the statute, prohibited advancement of MMA includes, but is not limited to (1) "the creation, establishment or performance of a combative sport," (2) "the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor," (3) "the solicitation or inducement of persons to attend or participate therein," (4) "the actual conduct of the performance thereof," (5) "the arrangement of any of its financial or promotional phases," or (6) "any other phase of a combative sport."  Id.

The Court finds that the Ban's prohibition against knowingly profiting from a combative sport activity criminalizes only the financial arrangements relating to professional, live-performance MMA.  This provision does not implicate overbreadth concerns because it does not target expressive conduct.  Rather, by focusing on the receipt of money in furtherance of professional MMA, this provision plainly and legitimately targets only the financial support of otherwise illegal conduct that this Court has already determined is not entitled to First Amendment protection.  See 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 497 n.7 (1996) ("[T]he First Amendment does not protect commercial speech about unlawful activities."); see also Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 463 n.20 (1978) (noting that the overbreadth doctrine "applies weakly, if at all," to commercial speech).

The "advances" clause presents a slightly closer question.  The examples of prohibited activities mentioned in the statute, however, satisfy the Court that the Ban does not reach a substantial amount of protected conduct.  Several of the examples are directly tied to the actual performance of the combative sport.  See N.Y. Unconsol. Laws § 8905-a(3)(b) (e.g., "the creation, establishment or performance of a combative sport," and "the actual conduct of the

performance thereof").  Other examples are tied to the physical or financial arrangement of combative sports.  Id. ("the acquisition or maintenance of premises, paraphernalia, equipment or apparatus therefor," and "the arrangement of any of its financial or promotional phases").  These provisions, like the "profits from" clause, cannot implicate a substantial amount of protected expressive activity, because illegal conduct and proposals to engage in illegal conduct are traditionally outside First Amendment protection.  See Williams, 553 U.S. at 297.

Another example of prohibited advancement of combative sport activity is "the solicitation or inducement of persons to attend or participate" in a combative sport. "Solicitation" and "inducement" are broad terms, but courts have nevertheless rejected overbreadth challenges to statutes with similar terminology.  See, e.g., id. at 294.  In fact "many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech (commercial or not) that is intended to induce or commence illegal activities."  Id. at 298.  Particularly when read in conjunction with the Ban's final catchall example—prohibiting conduct directed "toward any other phase of a combative sport"—these provisions of the Ban are clearly not intended to prohibit general advocacy or discussions of MMA, including lectures, educational courses, or the litigation of this lawsuit, as Plaintiffs claim.  A "phase" is "a stage or interval in a development or cycle," or "an aspect or part . . . of a situation or activity."  See Webster's Third New International Dictionary 1694 (1976).  By prohibiting only a "phase" of a combative sport, the Ban is clearly not designed to reach the limitless variety of protected activity that Plaintiffs allege.  (See, e.g., FAC ¶ 370; see also Pls.' Mem. 21 (citing FAC ¶¶ 70, 200, 205)).  MMA lectures, educational courses, and this lawsuit are simply not "phases" of a live, professional MMA event.  Such innocent activities are further protected by the Ban's strict scienter requirement.  See N.Y. Unconsol. Laws § 8905-a(3)(b)

(criminalizing only "knowingly" advancing or profiting from a combative sport activity); see also Williams, 553 U.S. at 294 (noting similar scienter requirement in a prohibition against the solicitation of child pornography).[8]

Plaintiffs' overbreadth challenge is therefore dismissed.

## V.   VOID FOR VAGUENESS

Plaintiffs next argue that the Combative Sport Ban is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment.  "Among the most fundamental protections of due process is the principle that no one may be required at peril of life, liberty or property to speculate as to the meaning of . . . statutes.  All are entitled to be informed as to what the State commands or forbids."  Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y., 660 F.3d 612, 620 (2d Cir. 2011) (citations, quotation marks, and alterations omitted).

In general, a statute may be void for vagueness (i) "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (ii) "if it authorizes or even encourages arbitrary and discriminatory enforcement."  Hill v. Colorado, 530 U.S. 703, 732 (2000).  The former ground requires that individuals receive "fair notice or warning" of what specific conduct is prohibited, Thibodeau v. Portuondo, 486 F.3d 61, 65 (2d Cir. 2007), whereas the latter is concerned with providing "explicit standards" for officials who enforce the law, thereby avoiding "resolution on an *ad hoc* and subjective basis," Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972).

---

[8] Although the statute does not specifically tie the "advances or profits from" prohibition to MMA occurring in New York State, given that the Ban prohibits only combative sports "conducted, held or given within the state of New York," N.Y. Unconsol. Laws § 8905-a(2), the most natural understanding is that the Ban is not concerned with promotional or educational activities relating to MMA occurring outside the State.  See Auburn Hous. Auth. v. Martinez, 277 F.3d 138, 144 (2d Cir. 2002) (directing courts to interpret statutory meaning by examining provision in context, "by appreciating how sections relate to one another").  To the extent that the Ban may, in certain limited circumstances, chill legal speech relating to MMA occurring outside of New York, the Court finds this possibility insufficient to trigger overbreadth concerns.  When judged in relation to the statute's "plainly legitimate sweep," the Court concludes that Plaintiffs have failed to demonstrate that the law "punishes a substantial amount of protected free speech."  Hicks, 539 U.S. at 118-19.

Relying on both grounds, Plaintiffs contend that the Ban is unconstitutionally vague, both as applied to the conduct in which they wish to engage, and on its face.  As is the preferred practice, the Court will first consider Plaintiffs' as-applied challenge, and then turn to Plaintiffs' facial challenge.  See Farrell, 449 F.3d at 485 (quoting Vill. of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 495 (1982)).  As discussed in greater detail below, the Court concludes that Plaintiffs have sufficiently alleged an as-applied vagueness challenge to the law; the Court finds that Plaintiffs' facial challenge, however, should be dismissed.

### A.      Plaintiffs' As-Applied Vagueness Challenges

Plaintiffs assert that the Ban is unconstitutionally vague as applied to: (i) professional MMA sanctioned by exempt organizations, (ii) amateur MMA, (iii) MMA instruction and demonstration, and (iv) professional MMA events on Indian reservations.  Plaintiffs also contend that the phrase "advances or promotes" is vague as applied to bar owners who hold MMA-related events, websites that promote or cover MMA, and MMA instructors and gym owners. (FAC ¶ 383).  Plaintiffs argue that, as applied to these activities, the Ban "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and also "authorizes . . . arbitrary and discriminatory enforcement."  Hill, 530 U.S. at 732.

Before turning to the merits of Plaintiffs' as-applied arguments, the Court rejects Defendants' position that the alleged erratic history of enforcement of the Ban is irrelevant to Plaintiffs' vagueness claim.  (See Defs.' Mem. 17).  In this case, Plaintiffs support their vagueness claim with allegations that the Ban has been interpreted and applied in varied and conflicting ways.  See supra Part I.F (discussing New York's enforcement of the Combative Sport Ban).  Courts routinely consider such evidence in adjudicating vagueness claims.  See, e.g., Cunney, 660 F.3d at 623 (holding that the defendant's actions and admissions "demonstrate that

no explicit standards exist regarding the method with which to measure from the easterly side of River Road," and therefore "could encourage potentially arbitrary or ad hoc enforcement"); Farrell, 449 F.3d at 491 (considering parole officer's testimony regarding his understanding and practice); Chatin v. Coombe, 186 F.3d 82, 89 (2d Cir. 1999) (concluding, based on testimony of an enforcing official, that the rule was unconstitutionally vague because various employees understood the rule differently). Indeed, courts in this circuit regularly dismiss vagueness claims that lack such evidence. See, e.g., Small v. Bud-K Worldwide, Inc., 895 F. Supp. 2d 438, 451 n.11 (E.D.N.Y. 2012) (rejecting vagueness argument where "there is simply insufficient evidence of arbitrary or discriminatory enforcement based upon the purported vagueness of the terms"); Genco Importing Inc. v. City of New York, 552 F. Supp. 2d 371, 384 (S.D.N.Y. 2008) (Kaplan, J.) (finding that plaintiff had failed "to allege any facts from which the Court reasonably could infer that the [statute] . . . continue[s] to chill the protected speech of parties not before the Court").

Although a court should consider many factors in assessing vagueness, including a statute's "plain meaning and stated purpose," VIP of Berlin, LLC v. Town of Berlin, 593 F.3d 179, 192 (2d Cir. 2010) (internal citation and quotation marks omitted), evidence of arbitrary interpretation and enforcement can support a vagueness claim. Based in part on such evidence, the Court declines to dismiss Plaintiffs' as-applied arguments to the extent they relate to professional MMA sanctioned by exempt organizations, amateur MMA, and professional MMA events on Indian reservations.

### i.   *Professional MMA Sanctioned By "Exempt" Organizations*

The Ban exempts "martial arts" from the scope of prohibited combative sport activities. See N.Y. Unconsol. Laws § 8905-a(1). The Ban states that the term "'martial arts' shall include

any professional match or exhibition sanctioned by various organizations, including the WKA

(hereinafter "exempt organizations").  Id.  A plain reading of this provision suggests that

Plaintiffs would be allowed to promote a professional MMA event in New York if the event

were sanctioned by one of the exempt organizations.  Although Defendants initially agreed with

this interpretation, they have now reversed course.

This issue first arose at oral argument on Defendants' motion to dismiss.  At argument,

counsel for Defendants interpreted the statute to mean that "one of the[] exempt organizations

*could* sanction a[n MMA] event."  (Tr. 49:13-15 (emphasis added); see also Tr. 70:19-22 ("[I]t

appears that . . . exempt organizations . . . *could sanction* a sport that would otherwise be a

combative sport." (emphasis added))).  Indeed, Defendants stated that their reading of the statute

had been verified by attorneys for the SAC.  (See Tr. 70:14-15).

Only a few weeks later, however, in supplemental briefing to the Court, Defendants

changed course.  They now take the position that the Ban would "*not* permit a professional

MMA event in New York even if sanctioned by an exempt organization."  (Defs.' Supp. Mem.

of Law 1 (footnote omitted, emphasis added) [Dkt. No. 46]).  Defendants justify this position,

not by relying on the statutory language, but by resorting to the Ban's legislative history, which

Defendants claim "clearly shows that a total ban of professional Ultimate Fighting/MMA was

the primary purpose of the law."  (Id. at 7; see also Senator Goodman, Introducer's

Memorandum, Ex. A to Supp. Decl. of John M. Schwartz dated Mar. 22, 2013 [Dkt. No. 47]).

This legislative history is of limited value.  Although legislative history may be

"relevant," in general, the "unambiguous language of a statute is alone determinative."  Riley v.

Cnty. of Broome, 742 N.E.2d 98, 102 (N.Y. 2000) (internal quotation marks and citations

omitted).  Furthermore, MMA has changed substantially since the Ban was enacted, making the

legislative history, which relates to earlier versions of MMA, of little relevance.  (Compare
Goodman Memorandum (discussing "no holds barred," "anything goes" fighting), with FAC ¶¶
48-53, 92-101 (discussing MMA's modern rules and safety record)).

In light of Defendants' varying interpretations of the statutory language, the Court finds
that Plaintiffs have adequately alleged that the statute is unconstitutionally vague with respect to
professional MMA sanctioned by exempt organizations.

ii.     *Amateur MMA Events in New York*

The New York Ban on combative sports prohibits "any professional match or
exhibition," but does not define the term "professional."  Plaintiffs allege that the vagueness of
the term "professional" is evidenced by the SAC's inconsistent interpretation of the word: the
SAC has at times stated that amateur MMA is banned by the statute, and at other times has stated
that amateur MMA is permitted.  (Compare FAC ¶ 164 (quoting SAC spokesperson stating
"combative sports, either on a professional or amateur basis, are prohibited in New York State"),
and ¶ 166 ("Beginning around 2002, the [SAC] sent cease and desist letter to shut down amateur
combative sport events."), with ¶ 165 (quoting SAC public statements, made in support of 2001
Liquor Law, that the Ban did not apply to amateur events), and ¶ 170 (quoting SAC
representative stating, in 2003, that the SAC has "no jurisdiction over amateur events")).
Similarly, at times, when Plaintiffs and other promoters have sought to organize amateur MMA
events, the SAC advised that such events are illegal, and yet at other times the SAC has
permitted such events to occur.  (Compare FAC ¶ 164 (indicating that an amateur "Combat
Zone" event would violate the Ban), and ¶ 168 (quoting Scott Stevens, then-chair of the SAC,

that amateur Underground Combat League events are illegal), with ¶ 172 (noting that Plaintiff

Lilly produced an amateur MMA event in May 2012)).[9]

Defendants largely ignore this erratic enforcement history.  Rather, they focus on the

ordinary meanings of "professional" and "amateur," arguing that the two terms are plainly

distinguishable, and that professional MMA is banned, while amateur MMA is permitted.  See

BP Am. Prod. Co. v. Burton, 549 U.S. 84, 91 (2006) (statutory construction starts with the

statutory text, and "[u]nless otherwise defined, statutory terms are generally interpreted in

accordance with their ordinary meaning").  Defendants state that the term "professional" has a

clear meaning; Defendants define "professional" as:

1. [first definition omitted as inapplicable]
2. making some activity not usually followed for gain, such as a sport, the source
   of one's livelihood.
3. engaged in by professionals (sense 2); as, *professional* hockey.
4. engaged in a specified occupation for pay or as a means of livelihood; as, a
   *professional* writer.

(Defs.' Mem. 18 (citing Webster's New Twentieth Century Dictionary 1437 (World Publ. Co.,

2d ed. 1966))).  Relying on the same dictionary, Defendants note that "amateur" is defined as:

1. one who cultivates a study or art from taste or attachment without pursuing it
   professionally.
2. in modern athletic sports, an athlete who has never used any athletic art
   professionally or as a means of livelihood; one who has not taken part in
   contests open to professionals.  The term is variously and more specifically
   defined by different athletic associations.
3. a person who does something more or less skillfully.

(Id.).  Defendants contend that the Ban is clear—giving "professional" its ordinary (dictionary)

meaning, professional MMA is banned, while amateur MMA is permitted.

---

[9] Defendants have taken the position that the changing positions of the SAC are irrelevant to Plaintiffs'
vagueness claim because the SAC "has no responsibility or authority to enforce the [Ban]," and the SAC does not
"have any authority over combative sport" other than "boxing, sparring, [and] professional wrestling."  (Tr. 46:21-
22, 47:11-12).  Defendants then attempt to explain the SAC's various statements regarding MMA and combative
sports activities.  (Tr. 47, 48).  These arguments may have some validity, but they relate to the weight and effect of
the SAC's statements—issues of fact that are inappropriate to consider at the motion to dismiss stage.

Although the distinction between professional and amateur is no doubt clear in some cases, Plaintiffs have raised serious questions regarding the utility of such generic definitions in differentiating close cases.  At one point, state officials defined a "professional" match as "one where compensation is received by the contestants for their participation."  (FAC ¶ 174).  At another point, state officials defined a "professional" match as one where "tickets were sold for the event."  (Id.).  Subsequently, the SAC took the position that a "professional" event involved not only events where the fighters are paid, but also where the fighters include a martial arts instructor or martial arts school owner.  (Id.).[10]

In light of the Ban's failure to define "professional" or "amateur," and the SAC's alleged inconsistent interpretation of these words, the Court finds that Plaintiffs have sufficiently alleged this as-applied challenge.

### iii.     MMA Instruction and Demonstration

Plaintiffs next contend that the application of the Ban is unconstitutionally vague as applied to MMA instruction and demonstration.  Plaintiffs note that although the Ban prohibits any "professional match or exhibition," it does not define what constitutes an "exhibition." (FAC ¶¶ 204-05).  This stands in contrast to New York's boxing and wrestling regulations, which define an "exhibition" as "an engagement in which the participants show or display their skill without necessarily striving to win."  (FAC ¶ 204 (quoting N.Y. Comp. Codes R. & Regs. tit. 19, § 205.1(d))).  The boxing and wrestling regulations also note that exhibitions can be held "solely for training purpose[s]," but exempt such training exhibitions from referee requirements. See N.Y. Unconsol. Law § 8923.  Based on these provisions, Plaintiffs contend that the Ban is vague as to whether MMA instruction is permitted.

---

[10] It is worth noting that although the Ban does not define "professional," the regulations governing boxing and wrestling define both "professional" and "amateur."  N.Y. Comp. Codes R. & Regs. tit. 19, § 205.1(l), (a).

The Court rejects this argument.  First, the term "exhibition" has a clear, ordinary meaning.  See Webster's Third New International Dictionary 1694 (1976) (defining "exhibition" as "an act or instance of showing, evincing, or showing off" or "a public show or showing").  This meaning neither "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," nor "authorizes or even encourages arbitrary and discriminatory enforcement."  Hill, 530 U.S. at 732.  Moreover, unlike Plaintiffs' first two as-applied challenges, Plaintiffs have not alleged that the term "exhibition" has been interpreted in an erratic manner, nor have they alleged that MMA instruction has been at times permitted, and at times prohibited.  Although courts do not require a plaintiff to actually violate a criminal statute in order to bring a vagueness challenge, courts must nonetheless ensure that a "justiciable case and controversy" exists.  Holder v. Humanitarian Law Project, 130 S. Ct. 2705, 2717 (2010).  Absent any evidence of enforcement against MMA instruction or demonstration, and given the clear meaning of "exhibition," the Court will not permit Plaintiffs to assert this purely speculative as-applied challenge.

iv.    *Professional MMA Events on Indian Reservations in New York*

Plaintiffs also argue that the Ban is unconstitutionally vague as applied to "Professional MMA events on Indian reservations in the State."  (FAC ¶ 382).  Plaintiff Lilly was told by the SAC that live MMA was illegal, with the exception of events on Indian reservations, where, according to the Commission, the State has no jurisdiction.  (FAC ¶ 282).  Plaintiffs further allege, however, that the AG issued "an informal opinion that 'professional' [MMA] events on sovereign Indian lands in the State are illegal and the Ban is enforceable on those lands."  (FAC ¶ 382).  "Were the Ban clear as to whether Professional MMA bouts on Indian reservations

located in the State are legal," the fighter Plaintiffs allege that they would compete in such bouts and Plaintiff Zuffa would produce Professional MMA events on Indian reservations.  (Id.).

Given that Defendants do not appear to address Plaintiffs' as-applied challenge with respect to Indian reservations, the Court will not dismiss this challenge.

<blockquote>v.  <em>Bar Owners Who Hold MMA-Related Events, Websites that Promote or Cover MMA Events, and MMA Instructors and Gym Owners</em></blockquote>

In addition to banning actual combative sport activity, the Ban also makes it a misdemeanor for any person to "knowingly advance[] or profit[] from a combative sport activity."  § 8905-a(3)(a).  "A person advances a combative sport activity when, acting other than as a spectator, he or she engages in conduct which materially aids any combative sport."  § 8905-a(3)(b).  Examples of such prohibited conduct include acquiring or maintaining premises for use in a combative sport, soliciting people to attend a combative sport event, financing or promoting a combative sport event, or "any other phase of a combative sport."  Id.

Plaintiffs argue that because the Ban's prohibition against advancing or profiting from a combative sport is not limited to events taking place inside New York, it may reach a variety of in-state activity relating to out-of-state MMA, including: New York bar owners who hold MMA-related events (Plaintiff Hamill), New York based websites that promote or cover MMA (Plaintiff Hobeika), and New York MMA instructors and gym owners who train professional MMA fighters (Plaintiff Kardian).  (FAC ¶¶ 200-03, 383).  Apparently acknowledging the ambiguity of the "advances or profits" provision, Defendants argue that the statute's legislative history makes clear that these activities are not prohibited because the Ban was intended to reach only MMA activity within the State.  In particular, Defendants rely on: (1) the Governor's approval memorandum, stating that the Ban was "not intended to apply to persons promoting . . . a combative sport event lawfully occurring outside the State," and (2) Senator Goodman's

statements, during the legislative debate, that the Ban was not intended to block "television broadcasts of prohibited conduct."  (Schwartz Decl. Exs. E, F).

Although the Court acknowledges Plaintiffs' references to legislative history suggesting that certain legislators were concerned by the Ban's broad language, (FAC ¶ 199 (quoting statements of State Senators made during legislative debate)), the Court concludes that Plaintiffs' factual allegations regarding potential criminal liability for UFC fight nights, UFC websites, and MMA instructors and gym owners is insufficient to support an as-applied challenge.  As a preenforcement vagueness challenge, Plaintiffs must demonstrate that they face "a credible threat of prosecution."  Humanitarian Law Project, 130 S. Ct. at 2717 (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)).  Although Plaintiffs note various activities that may theoretically fall within the "advance or promote" provision, Plaintiffs' sole factual allegation supporting this provision's vagueness is that, in May 2007, the SAC sent a letter to journalist Jim Genia, "informing him that a planned [amateur] UCL bout at a local boxing gym violated the Ban and that he could face civil penalties if he continued to promote the event." (FAC ¶ 172).  Genia's only conduct promoting the event, however, was maintaining a "mailing list of individuals interested in attending UCL matches."  (FAC ¶¶ 172, 203).  This allegation has no relation to Plaintiffs' as-applied challenge with respect to UFC fight nights, websites, and gym owners.  See Babbitt, 442 U.S at 298-99 (explaining that "imaginary or speculative" fears of prosecution are insufficient to sustain a pre-enforcement challenge).

The Court therefore dismisses this aspect of Plaintiffs' as-applied claim.

### B.      Plaintiffs' Facial Vagueness Challenge

Having found that Plaintiffs have adequately stated an as-applied vagueness challenge to the Ban, the Court now turns to Plaintiffs' facial vagueness challenge.

The parties dispute whether Plaintiffs are permitted to bring a facial challenge in the first place.  Defendants contend that the Supreme Court's instruction in <u>Humanitarian Law Project</u> effectively eliminated facial challenges outside of the First Amendment context.  <u>See</u> 130 S. Ct. at 2718-19 (stating that, in the context of an as-applied challenge, courts should "consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" (citing <u>Hoffman Estates</u>, 455 U.S. at 495)).  Plaintiffs counter that, given that <u>Humanitarian Law Project</u> did not involve a facial challenge, it "could hardly have disallowed them."  <u>See id.</u> at 2716 (explaining plaintiffs' various as-applied arguments).

Defendants are correct that "[i]n the absence of First Amendment concerns," which this Court has determined are not implicated by professional MMA, "courts generally view vagueness challenges to a statute as applied to the defendant's case."  <u>United States v. Farhane</u>, 634 F.3d 127, 138 (2d Cir. 2011).  To the extent that "a facial challenge may be maintained against a statute that does not reach conduct protected by the First Amendment, the . . . test is, in fact, only a variation on as-applied analysis, requiring the defendant to show 'that the law is impermissibly vague in all of its applications.'"  <u>Id.</u> at 138-39 (citing <u>Hoffman Estates</u>, 55 U.S. at 497); <u>see also</u> <u>United States v. Salerno</u>, 481 U.S. 739, 745, (1987) (stating in the context of a substantive due process challenge that "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid").

Plaintiffs assert facial challenges with respect to: (i) the term "professional," (ii) the term "combative sport," (iii) the term "martial arts," (iv) the SAC's authority to modify "martial arts," (v) the phrase "advances or profits from a combative sport activity," and (vi) the term

"exhibition."  The Court concludes that these terms are not facially vague.  Plaintiffs simply cannot carry their heavy burden of establishing that these terms, in all of their applications, either leave the public uncertain as to what conduct is prohibited or lack appropriate standards of enforcement.  See Giaccio v. State of Pa., 382 U.S. 399, 402-03 (1966).

As discussed above, although the Ban does not define the terms "professional" or "exhibition," certain conduct that falls within the plain meaning of these terms is clearly intended to be the focus of the legislation.  For example, there is little doubt that a public event in which the participants fight for pay qualifies as a professional match.  Similarly, fighters who make a living based on MMA may engage in a public demonstration without necessarily striving to win, which would be deemed an exhibition.  Accordingly, these terms are not vague in all of their applications, and thus cannot support a facial challenge.  See, e.g., Richmond Boro Gun Club, Inc. v. City of New York, 97 F.3d 681, 684–86 (2d Cir. 1996) (finding no vagueness in definition of assault weapons to include "rifles or shotguns with a folding or telescoping stock or no stock" even though "some person might unwittingly violate the law by removing a stock for a brief period to clean or transport a weapon").

With respect to "combative sport," the Ban defines the term as a professional activity in which "the contestants deliver, or are not forbidden by the applicable rules thereof from delivering kicks, punches or blows of any kind to the body of an opponent or opponents."  N.Y. Unconsol. Laws § 8905-a.  Plaintiffs allege that in 2007, the SAC attempted to ban organized pillow fights (although it later changed its mind), while, in 2012, it permitted a "full metal jousting" event.  (FAC ¶¶ 176-78).  Although these allegations make clear that there will be close cases, the Plaintiffs in this case seek to participate in MMA, which, without a doubt, is a combative sport.  Courts have never required "perfect clarity and precise guidance" in order to

reject a vagueness challenge.  <u>Williams</u>, 553 U.S. at 304.  Indeed, "[c]lose cases can be imagined

under virtually any statute," but such problems are "addressed, not by the doctrine of vagueness,

but by the requirement of proof beyond a reasonable doubt."  <u>Id.</u> at 306.

 Plaintiffs next contend that the Ban's limited definition of the term "martial arts"—it

"shall include any professional match or exhibition sanctioned by any of the following [twelve]

organizations"—is vague for two reasons.  First, although the Ban states that martial arts "shall

include" matches sanctioned by exempt organizations, it fails to explain what else is included or

excluded.  Second, Plaintiffs allege that the SAC initially permitted "at least some additional

events not sanctioned by an exempt organization," such as kickboxing, (FAC ¶ 185), but later,

around 2002, concluded that "martial arts" "referred *only* to events sanctioned by an exempt

organization," (FAC ¶ 186).

 The Court finds these allegations insufficient to state a claim of facial vagueness.  The

Ban provides that martial arts "shall include" professional events sanctioned by certain exempt

organizations.  Plaintiffs argue that the phrase "shall include" is non-exhaustive and thus creates

ambiguity because the Ban fails to explain what other conduct is "included" as martial arts.  The

Court disagrees with this interpretation.  In this context, the phrase "shall include" is best

understood to be exhaustive.  Under this reading, the Ban defines martial arts as "comprising" or

"consisting of" *only* events sanctioned by exempt organizations.  (<u>See</u> Defs.' Mem. 21 (defining

"include," as defined in <u>Webster's New Twentieth Century Dictionary</u> (World Publ. Co., 2d ed.

1966))).  This interpretation is bolstered by the Ban's later use of the phrase "shall include but

are not limited to," which is more clearly intended to be non-exhaustive.  <u>See</u> N.Y. Unconsol.

Laws § 8905-a(1) ("Such process *shall include but not be limited to* consideration of the

following factors . . . ." (emphasis added)).  This interpretation is further supported by Plaintiffs'

own allegations, which make clear that since 2002 the SAC has consistently interpreted the phrase as exhaustive.  (FAC ¶ 186; see also ¶ 187).

Turning to the SAC's authority to modify the term "martial arts," Plaintiffs' essential complaint appears to be that the SAC has stated that it is not permitted to "add an organization that might sanction MMA."  (FAC ¶ 197).  The statute provides the SAC with authority to "promulgate regulations which would establish a process to allow for the inclusion or removal of martial arts organizations from the [exempt] list," and instructs the SAC to consider various factors when making its decision.  See N.Y. Unconsol. Laws § 8905-a(1) (listing three non-exhaustive factors).  Because the statutory language at issue provides the SAC with the discretion to make this determination, subject to the Ban's guidance limiting the administration of its authority, this portion of the statute is not unconstititutionally vague.[11]

Finally, the Court agrees with Plaintiffs that the phrase "advances or profits from a combative sport activity" is very broad.  This fact alone, however, does not mean that the statute is "impermissibly vague in all of its applications."  Farhane, 634 F.3d at 138-39.  As discussed above, the statute itself lists various categories of conduct that clearly fall within the Ban.  See N.Y. Unconsol. Laws § 8905-a(3)(b) (including conduct directed toward "the creation, establishment or performance of a combative sport," "the actual conduct of the performance [of combative sports]," and "the arrangement of any of [the] financial or promotional phases [of combative sports]").  Although there may be some ambiguity in the terms, where certain conduct is clearly proscribed, "[i]t would be premature to entertain this vagueness challenge based on a speculative threat of arbitrary enforcement 'until a broader use of the [Ban] is actually

---

[11] Plaintiffs also allege that the SAC has told certain kickboxing organizations that the SAC "lacks the authority to modify the list of exempt organizations."  (FAC ¶ 196).  Although that interpretation would be questionable, given that Plaintiffs have not actually sought to be added to the list of exempt organizations, this allegation would be more appropriate for an as-applied challenge on behalf of the kickboxing organizations.

initiated.'" Richmond Boro, 97 F.3d at 686 (quoting Brache v. Cnty. of Westchester, 658 F.2d

47, 52 (2d Cir. 1981); citing Hoffman Estates, 455 U.S. at 503-04).

Accordingly, the Court dismisses Plaintiffs' facial vagueness challenge.

## VI.   DUE PROCESS & EQUAL PROTECTION

In its earlier opinion, the Court dismissed Plaintiffs' original due process and equal

protection claims. See Jones, 888 F. Supp. 2d at 424-31. In particular, the Court determined that

rational basis review applied to Plaintiffs' claims, and that the Ban had a rational basis both

when it was passed, and today. Id. at 427.

Plaintiffs have now reasserted their due process and equal protection claims. Defendants

contend that the Court's prior decision and the law of the case doctrine bar Plaintiffs' amended

claims. (Defs.' Mem. 26-31). Plaintiffs counter that the law of the case doctrine is inapplicable

because the FAC contains numerous new factual allegations relating to the State's promotion of

boxing, the NYAG's interpretation of the Ban, and the State's response to increasing combative

sport activities. (Pls.' Mem. 34). The Court here reconsiders Plaintiffs' due process and equal

protection claims, as applied to the new factual allegations in the FAC, and concludes that

Plaintiffs' new factual allegations do not alter the Court's prior analysis.

As an initial matter, Plaintiffs contend that "to the extent First Amendment protected

activity is at issue, the standard is strict scrutiny not rational basis." (Pls.' Mem. 34-35 (citing

FAC ¶¶ 374, 397)). It is axiomatic that a Court is not required to accept as true a complaint's

legal conclusions. See Iqbal, 556 U.S. at 678. More importantly, the Court has already

determined that Professional MMA does not qualify as protected speech. See supra Part III.

Accordingly, the Court's prior conclusion—that the Combative Sport Ban triggers rational basis

scrutiny—remains applicable. Jones, 888 F. Supp. 2d at 424.

Applying rational basis review, the Court previously concluded "that: (1) the law had a rational basis when passed in 1997, and (2) even if developments in MMA are relevant, the law continues to have a rational basis today." Id. at 427.  Plaintiffs' amended allegations focus on recent MMA-related developments and the State's response.  In particular, Plaintiffs discuss Defendants' statement, made in their reply brief in support of Defendants' original motion to dismiss, that the Ban does not reach amateur MMA.  Even assuming that the Defendants did take such a position, this fact does nothing to change the Court's rational basis analysis, given that the Court's prior decision assumed that the State banned only professional, not amateur, MMA. E.g., id. at 424-25, 428-29.

Plaintiffs' next category of new allegations relate to the possibility that live professional MMA may take place so long as it is sanctioned by an exempt organization.  But once again, this possibility is also explicitly provided for in the Ban, see N.Y. Unconsol. Laws § 8905-a(1), and therefore was contemplated by the Court's prior decision.  Moreover, the state legislature could reasonably have concluded that MMA, when conducted under the approval of an exempt organization, is safer than unsanctioned MMA or MMA under the supervision of non-exempt organizations.  See F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993) ("[B]ecause we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").  The law's distinction between exempt and non-exempt organizations is thus sufficiently tethered to its purpose to pass rational basis scrutiny.  See Hayden v. Patterson, 594 F.3d 150, 170 (2d Cir. 2010) (noting that a court will not invalidate a law unless the "varying treatment of different groups or persons is so unrelated to the

achievement of any combination of legitimate purposes that [it] can only conclude that the

legislature's actions were irrational").  As the Court noted in its prior opinion:

> "It is no requirement of equal protection that all evils of the same genus be
> eradicated or none at all."  Jankowski-Burczyk v. I.N.S., 291 F.3d 172, 179 (2d
> Cir. 2002) (quoting Ry. Express Agency, Inc. v. New York, 336 U.S. 106, 110
> (1949)).  Rather, legislatures are afforded "substantial latitude" to establish
> classifications that "roughly approximate the nature of the problem perceived, that
> accommodate competing concerns both public and private, and that account for
> limitations on the practical ability of the State to remedy every ill."  Hayden, 594
> F.3d at 169 (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982)).

Jones, 888 F. Supp. 2d at 428.[12]

Although the Court recognizes Plaintiffs' contention that MMA is no less safe than other

sports that regularly occur in New York State (e.g., boxing), the legislature's decision to treat

MMA differently does not implicate due process or equal protection rights.

## VII.   COMMERCE CLAUSE

Plaintiffs next argue that the Ban violates the Commerce Clause by discriminating against

out-of-state businesses in favor of in-state businesses, unduly burdening interstate commerce,

and proscribing activity beyond New York's border.  (FAC ¶¶ 428-30).

The Commerce Clause provides that "Congress shall have Power . . . [t]o regulate

Commerce with foreign Nations, and among the several States."  U.S. Const. art. I, § 8, cl. 3.  "In

implementing the Commerce Clause, the Supreme Court has adhered strictly to the principle that

the right to engage in interstate commerce is not the gift of a state, and that a state cannot

regulate or restrain it."  Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 90 (2d Cir. 2009) (quoting

---

[12] The Court also rejects Plaintiffs' argument that the Ban irrationally prohibits the promotion of live, professional MMA events, while permitting other means of promoting MMA, such as broadcasting MMA on television or selling MMA toys.  (Pls.' Mem. 36).  First, this argument is somewhat of an about-face from Plaintiffs' overbreadth argument.  (See FAC ¶ 370 (alleging that the Ban prohibits protected conduct, including selling MMA t-shirts, UFC viewing parties, and broadcasting pay-per-view MMA)).  Second, even accepting Plaintiffs' current position, as stated above, there is "no requirement" under rational basis review that "all evils of the same genus be eradicated or none at all."  Ry. Express Agency, 336 U.S. at 110.  "Courts allow legislatures to implement programs 'step by step' and to adopt regulations that 'only partially ameliorate a perceived evil.'"  Jones, 888 F. Supp. 2d at 426 (quoting Minn. v. Clover Leaf Creamery Co., 449 U.S. 456, 464 (1981)).

Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 808 (1976) (internal quotation marks omitted)).  "Under the so-called 'dormant' Commerce Clause doctrine, a state's power to take actions impacting interstate commerce is limited."  Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d Cir. 2004).  A state statute or regulation may violate the dormant Commerce Clause only if it (i) "clearly discriminates against interstate commerce in favor of intrastate commerce," (ii) "imposes a burden on interstate commerce incommensurate with the local benefits secured," or (iii) "has the practical effect of 'extraterritorial' control of commerce occurring entirely outside the boundaries of the state in question."  Selevan, 584 F.3d at 90.  The Court considers each of these possibilities in turn and finds no violation.

### i.     The Ban Does Not Discriminate Against Interstate Commerce

Statutes that "clearly" discriminate against interstate commerce in favor of intrastate commerce are "virtually invalid per se."  Freedom Holdings, 357 F.3d at 216.  On its face, the Ban does not identify any in-state commercial interest that is favored, nor does it identify any out-of-state commercial interest that is disfavored.  See Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 169 (2d Cir. 2005).  The Ban prohibits both in-state and out-of-state interests from conducting professional MMA matches in New York State; it also permits both in-state and out-of-state interests to conduct amateur MMA matches in the State.  Accordingly, the Court finds that Plaintiffs have not alleged clear discrimination against out-of-state commercial interests.

### ii.    The Ban Does Not Excessively Burden Interstate Commerce

Plaintiffs next contend that the Ban is unconstitutional because "'the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.'"  United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 346 (2007)

(quoting Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970)).  The alleged burden derives from the fact that the Ban prohibits unsanctioned, professional MMA matches in New York State, which are primarily organized by out-of-state businesses (such as the UFC), whereas in-state interests are permitted to thrive by conducting amateur MMA events in local gyms and elsewhere.  (Pls.' Mem. 38 (citing FAC ¶ 428)).  This burden on interstate commerce is unjustified, Plaintiffs argue, because the State gains no benefit from the Ban.

Although this balancing test is a "fact-intensive determination," e.g., United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 261 F.3d 245, 264 (2d Cir. 2001), the Second Circuit has "repeatedly emphasized" that for "a state statute to run afoul of the Pike standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce."  United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth., 438 F.3d 150, 156 (2d Cir. 2006) (quoting Nat'l Elec. Mfrs. Ass'n v. Sorrell, 272 F.3d 104, 109 (2d Cir. 2001)); Grand River, 425 F.3d at 170.

In this case, the Court finds that Plaintiffs have not alleged a sufficient burden on interstate commerce to survive a motion to dismiss.  The Ban prohibits all unsanctioned, in-state, professional MMA matches.  Plaintiffs' only allegation suggesting a different impact on out-of-state interests is that the UFC, the nation's premier MMA promoter, is an out-of-state corporation.  But this fact alone does not burden interstate commerce because the Commerce Clause "protects the interstate market, not particular interstate firms."  Exxon Corp. v. Governor of Md., 437 U.S. 117, 127 (1978); see also CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 88 (1987) ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce.").

Putting this allegation aside, the Ban on professional MMA applies without regard to the geographic origin of the promoter or fighters; it therefore does not burden the interstate market. Moreover, to the extent that there exists a New York market for amateur MMA, MMA gyms, or MMA television, both in-state and out-of-state companies are equally permitted to compete in this market.  Indeed, Plaintiffs' own allegations make clear that the UFC already participates in the New York MMA market.  (See, e.g., FAC ¶ 66 (UFC-branded memorabilia sold in New York), ¶ 70 (Radio City Music Hall hosted a UFC news conference), Ex. H (UFC Times Square Billboard advertised UFC pay-per-view event)).

Accordingly, Plaintiffs have not alleged an excessive burden on interstate commerce.

> ### iii. The Ban Does Not Have the Practical Effect of Extraterritorial Control of Commerce

Finally, Plaintiffs contend that the Ban violates the Commerce Clause because it "has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction."  Am. Booksellers Found. v. Dean, 342 F.3d 96, 102 (2d Cir. 2003); see also Healy v. Beer Inst., 491 U.S. 324, 336 (1989) (noting that a statute violates the Commerce Clause when it "directly controls commerce occurring wholly outside the boundaries of a State").  Statutes that have such an effect are said to have "extraterritorial" operation.  See Sorrell, 272 F.3d at 110. However, the extraterritoriality decisions were rendered in a far different context and are inapplicable to this case.  Healy, 491 U.S. 324, and Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573 (1986), "involved efforts by a state to control the prices at which goods are sold in the state by pegging them to the lowest price charged for the same goods in other states.  The effect of those price-regulation statutes on commerce in foreign states was inescapable: they necessarily require[d] out-of-state commerce to be conducted according to in-state terms."  Sorrell, 272 F.3d at 110.

In this case, Plaintiffs do not allege that the Ban pegs or affects the price of in-state or out-of-state goods or services in any way.  Rather, New York bans only combative sport activity taking place within the state and leaves out-of-state MMA untouched.  The Second Circuit has rejected other attempts to shoehorn statutes that do not mention other states into the Supreme Court's extraterritorial control line of cases.  See, e.g., Sorrell, 272 F.3d at 110 (rejecting Commerce Challenge to Vermont lamp-labeling statute which made "no mention of other states for any purpose"); Freedom Holdings, 357 F.3d at 221 ("While the out-of-state wholesale prices of cigarettes may be affected by the Contraband Statutes, therefore, out-of-state actors such as appellants remain free to conduct commerce on their own terms, without either scrutiny or control by New York State.").  The Ban does not refer to other states; accordingly, there is no extraterritorial control issue.

Plaintiffs allege that the Ban "*could* exert" an extraterritorial effect, "that advertisers and merchandisers *might* limit their exposure in the New York market," and that this "*may* affect advertising and merchandising that occurs in neighboring states where Professional MMA is entirely legal."  (FAC ¶ 430 (emphases added)).  But in light of Plaintiffs' allegations that MMA advertising and merchandising currently occur in New York, (FAC ¶¶ 66, 70, Ex. H), the Court finds Plaintiffs' speculation to be insufficient to state a plausible claim of unconstitutional extraterritorial effect.  See, e.g., SPGGC, LLC v. Blumenthal, 505 F.3d 183, 192-195 (2d Cir. 2007) (rejecting extraterritoriality argument where "SPGGC fails to allege any facts tending to show . . . how the effects of the Gift Card Law might be projected into other state. . . . [T]he Gift Card Law does not, by its terms or effects, directly regulate sales of gift cards in other states."); see also Osborn v. Ozlin, 310 U.S. 53, 62 (1940) ("The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within

that domain which the Constitution forbids."). Given that Plaintiffs have not demonstrated that the alleged extraterritorial impact of the Ban constitutes "regulati[on of] commerce," "control [of] commerce," "projection of one state regulatory regime into the jurisdiction of another State," or "application of a state statute to [extraterritorial] commerce," Healy, 491 U.S. at 332, 336-37, the Court dismisses Plaintiffs' extraterritoriality claim.

## VIII.   THE 2001 LIQUOR LAW

Similar to the Combative Sport Ban, the 2001 Liquor Law bans any venue licensed by the State to serve alcohol from hosting an event at which contestants deliver "kicks, punches or blows of any kind, . . . whether or not the event consists of a professional match or exhibition, and whether or not the event . . . is done for compensation." N.Y. Alco. Bev. Cont. Law § 106(6-c)(a). The law exempts "boxing, sparring, wrestling, or martial arts" that are excluded from the Combative Sport Ban. Id. § 106(6-c)(b).

Plaintiffs contend that the 2001 Liquor Law effectively prohibits venues throughout New York from hosting sanctioned, regulated, safe performances of live MMA. (FAC ¶ 435). Plaintiffs challenge the liquor law "*solely* as applied to live MMA," arguing that the law violates their First Amendment rights. (FAC ¶¶ 436-37).[13] Defendants counter that the NYAG is not a proper defendant with respect to this claim, because whereas the Ban authorizes the NYAG "to commence judicial proceedings . . . to enforce the [Ban's] provisions," see N.Y. Unconsol. Law § 8905-a(3)(d), the 2001 Liquor Law does not reference the NYAG. This omission is significant, given that another provision of the Alcoholic Beverage Control Law does reference

---

[13] Plaintiffs contend that the 2001 Liquor Law violates their "First Amendment rights and their Fourteenth Amendment rights to the equal protection of the laws." (FAC ¶ 438). The Court assumes that Plaintiffs cite the Fourteenth Amendment for the general principle that the First Amendment is applicable to the States. See, e.g., McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 336 (1995). To the extent that Plaintiffs assert a separate equal protection claim, the Court dismisses the claim for the same reasons that the Court dismissed Plaintiffs' first equal protection claim in Part VI.

the NYAG.  See N.Y. Alco. Bev. Cont. Law § 79-c (authorizing the NYAG to report violations

of provision relating to direct interstate wine shipments).  The 2001 Liquor Law, in contrast,

provides that violations of the law may be punished only by suspension or revocation of the

offender's liquor license, see N.Y. Alco. Bev. Cont. Law § 106(6-c)(c), which falls within the

purview of the New York State Liquor Authority (NYSLA), not the NYAG, see N.Y. Alco. Bev.

Cont. Law § 17(3).  Although the NYAG is generally responsible for the enforcement of New

York laws, "the vast majority of courts to consider the issue have held . . . that a state official's

duty to execute the laws is not enough by itself to make that official a proper party in a suit

challenging a state statute."  See Warden v. Pataki, 35 F. Supp. 2d 354, 359 (S.D.N.Y. 1999)

(Mukasey, J.), aff'd sub nom. Chan v. Pataki, 201 F.3d 430 (2d Cir. Oct. 20, 1999)

(unpublished); see also Nolan v. Cuomo, No. 11 Civ. 5827, 2013 WL 168674 (E.D.N.Y. Jan. 16,

2013) (same); Wang v. Pataki, 164 F. Supp. 2d 406, 410 (S.D.N.Y. 2001) (Sweet, J.) (same);

Romeu v. Cohen, 121 F. Supp. 2d 264, 272 (S.D.N.Y. 2000) (Scheindlin, J.) (same), aff'd, 265

F.3d 118 (2d Cir. 2001).  In fact, Plaintiffs have not suggested that the NYAG has any

connection with the enforcement of the Ban.  See In re Dairy Mart Convenience Stores, Inc., 411

F.3d 367, 372-73 (2d Cir. 2005) ("So long as there is [some] connection [with enforcement of

the law], it is not necessary that the officer's enforcement duties be noted in the act." (quoting

and citing Ex Parte Young, 209 U.S. 123, 154 (1908))).  Given that violations of the liquor law

are punished by suspensions or revocations of a venue's liquor license, see N.Y. Alco. Bev.

Cont. Law § 106(6-c)(c), the NYSLA, not the NYAG, would appear to be the enforcing

authority.  See N.Y. Alco. Bev. Cont. Law § 17(3).

      Accordingly, under the facts alleged, the Court dismisses this cause of action.[14]

---

[14] Plaintiffs request leave to add the NYSLA (or its officers) as a defendant for the limited purposes of
challenging the 2001 Liquor Law.  (Pls.' Mem. 40 n.17).  Defendants have not opposed this request.  Although the

**IX.     CONCLUSION**

For the aforementioned reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.  [Dkt. No. 36].  Consistent with this opinion, Plaintiffs' as-applied vagueness challenge is not dismissed; the remainder of Plaintiffs' claims are dismissed.

SO ORDERED.

Dated: New York, New York
       September 30, 2013

                                        /s/_____
                                             KIMBA M. WOOD
                                          United States District Judge

---

Court will grant leave to amend, Plaintiffs should not amend their complaint unless the amendment asserts claims different from the claims that this Court has already dismissed.  (See supra Part III).